# United States Court of Appeals
## For the First Circuit

No. 06-1577
No. 06-1578

INCASE INCORPORATED,

Plaintiff, Appellant/Cross-Appellee

v.

TIMEX CORPORATION,

Defendant, Appellee/Cross-Appellant

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor, U.S. District Judge]

Before

Torruella, Circuit Judge,
Stahl, Senior Circuit Judge,
and Howard, Circuit Judge.

Sandra J. Staub, with whom Allison, Angier & Bartmon LLP were
on brief, for plaintiff-appellant/cross-appellee.
Timonth W. Mungovan, with whom Stephen M. LaRose and Nixon
Peabody LLP were on brief, for defendant-appellee/cross-appellant.

May 24, 2007

**STAHL**, **<u>Senior Circuit Judge</u>**.  Incase, Inc. ("Incase"), won jury verdicts against Timex Corporation ("Timex") in the United States District Court for the District of Massachusetts on its claims of misappropriation of trade secret, breach of contract, and implied contract.  The district court subsequently granted judgment as a matter of law to Timex on the trade secret and implied contract claims.  In a subsequent bench trial, the district court also found that Timex had committed unfair and deceptive trade practices, but denied Incase punitive damages.  Incase now appeals the judgment as a matter of law and the denial of punitive damages.  Timex cross-appeals on the denial of its motions for judgment as a matter of law on the remaining claim, and the holding that it committed unfair and deceptive trade practices.  Timex also appeals the denial of its motion for a new trial.  We affirm the decisions in all respects.

## I. Background

We recite the facts in the light most favorable to the jury's verdict.  <u>Azimi</u> v. <u>Jordan's Meats, Inc.</u>, 456 F.3d 228, 232 (1st Cir. 2006).

Incase is a designer and manufacturer of injection-molded plastic packaging products, located in Hopedale, Massachusetts.  In late 1997 and early 1998, Incase had discussions with Timex, a manufacturer of watches and other electronics based in Middlebury, Connecticut, about providing packaging for some of Timex's watches.

-2-

Following these meetings, Incase began working on several packaging products for Timex, including the watch holders at issue here.

Incase's usual procedure is to provide design services in conjunction with its manufacturing. Incase does not charge directly for the design services, but their expectation is that, if the design is satisfactory to the client, then Incase would receive a contract to manufacture the product.

The products at issue in this case are two watch packages, known as the "S-4" and "S-5."[1] Each is comprised of a series of integrated plastic components, including a ring or collar (which functions like a wrist) on a fixed base. The whole package allows for secure retail display of the watch without having to remove it from its packaging. The S-4 and S-5 differed in the way the "price flag" was incorporated into the package. The price flag is a small plastic component attached to the base that can display the price, SKU,[2] or other information. In the S-4, the price flag is fixed, while in the S-5, the price flag is moveable and removable. The removable price flag was important to Timex, since

---

[1]The S-5 is also referred to by the parties and the district court as the "Universal" design, the "G-4," and the "S-4 revision." There is some indication that the term "S-5" may not have been used until Timex contracted with Yuhing, as discussed further below. For the sake of clarity, we will simply refer to these two designs as "S-4" (the holder with a fixed price flag) and "S-5" (the holder with a movable price flag).

[2]"Stock Keeping Unit," an identifying code used in inventory management.

it allowed for better use of its automated manufacturing and distribution system, and because it allowed retailers to use the same watch holder for both promotional and everyday display. Timex had used moveable and removable price flags before, but prior designs had only two positions, while the S-5's price flag had three, and later four. The removable price flag is the focus of Incase's misappropriation of trade secrets claim.

By May 1998, the S-4 design was complete and Timex wanted to move toward developing the molding and tooling required for manufacture. Incase, which contracts out the tooling for its products, asked Timex to pay for the cost of tooling. Timex agreed, but asked that Incase cover the cost up-front, with Timex reimbursing Incase later. Incase agreed, provided that Timex commit to purchasing a certain number of units. In a meeting in May 1998, Timex agreed to purchase two million units per year for three years, and Incase agreed to pay the up-front cost for the tooling, which was not to exceed $133,000.[3] On July 6, 1998, Timex faxed to Incase a purchase order that said, in part:

> Timex will purchase six million holders between January 1, 1999[,] and December 31,

---

[3]In its decision for the Mass. Gen. Laws ch. 93A, § 11, claim, the district court found that the parties agreed either that the cost of tooling for the S-4 holders would not exceed $133,000, or that they would negotiate later toward a final cost. Incase, Inc. v. Timex Corp., 421 F. Supp. 2d 226, 232 (D. Mass. 2006).

-4-

2000.[4]  However, this purchase is contingent upon Incase remaining competitive with the industry.  The current piece prices are as follows: Large $0.1100, Small $0.1075.

The purchase order also stated, "Tooling cost not to exceed $133,000."  The parties continued to negotiate over tooling costs after this purchase order, ultimately settling on a tooling price of $126,000.[5]

After completing the tooling negotiation, Timex issued a new purchase order on October 26, 1998, that recited the same per-unit prices for the S-4 holders, but stated a quantity of only two million holders, rather than six million.  Incase began manufacturing S-4 holders under the purchase order in October 1998.  Timex ordered 300,000 units between October and December 1998, but the orders gradually declined until finally ceasing entirely in August 2000.  Ultimately, Incase delivered a total of 2,731,500 S-4 units to Timex.

In the meantime, Incase and Timex had begun working on the S-5 design, with the removable price flag.  Over the course of 1998, the parties went back and forth with specifications, design ideas, and at least twenty prototypes.  The design was largely

--------

[4]The parties do not address the fact that this writing covers two years, rather than three.  We do not believe the discrepancy is relevant to this appeal.

[5]Including tooling for other parts of the product, the total tooling cost was $397,200.

complete by May 1999, but Timex never placed any orders or entered into a contract for the manufacturing of the units.

By August 1999, Timex, unbeknownst to Incase, was in discussions with Yuhing, a Philippines manufacturing concern, with a view toward their producing the S-5. In its dealings with Yuhing, Timex relied on Incase's drawings and prototypes of the S-5. The S-5 that Yuhing ultimately produced differed in some minor respects from the S-5 that Incase had developed, though each incorporated the removable price flag.[6] By May 2000, Yuhing was manufacturing S-5 units for Timex. Ultimately, Timex purchased 3,569,000 S-5 units from Yuhing.

Timex never notified Incase that it had given the manufacturing work for the S-5 to a different company. In March 2001, Frank Zanghi, vice president of Incase, was in a Target store when he noticed Timex products displayed in Yuhing's S-5 package, with the price flag derived from Incase's price flag design. Incase subsequently brought suit in Massachusetts state court against Timex, alleging breach of contract to purchase six million S-4 holders, misappropriation of trade secrets for the S-5 price flag, unjust enrichment/implied contract[7] for use of Incase's S-5

---

[6]The Yuhing price flag had four positions, while Incase's model had three.

[7]Incase had originally titled this claim as "conversion," but the district court ultimately treated it as a quasi-contract claim, re-titling it "unjust enrichment/implied contract."

design, and unfair and deceptive trade practices in violation of Mass. Gen. Laws ch. 93A, § 11 ("Chapter 93A").[8] Timex removed the case to United States District Court based on diversity of citizenship.

Following trial on the contract, implied contract, and trade secret claims, a jury returned a verdict for Incase on all claims.[9] Timex moved for a judgment as a matter of law, and the district court granted the motion with respect to the trade secret and S-5 implied contract claims, but allowed the S-4 breach of contract verdict to stand. Timex also moved for a new trial on the basis of unfair surprise, because Incase had changed its damages theory shortly before trial. The district court denied the new trial motion.

The district court then conducted a bench trial on the Chapter 93A claim. The court found that Timex had violated Chapter 93A, Incase, Inc. v. Timex Corp., 421 F. Supp. 2d 226, 240-41 (D. Mass. 2006), but that it had not done so "wilfully" or "knowingly" under the statute, and therefore that Incase was not entitled to

---

[8]Incase also brought claims for breach of contract with respect to heart rate monitor packages and for fraud and misrepresentation, both of which were disposed of on summary judgment and are not part of this appeal.

[9]The jury awarded Incase $139,191 on the trade secret claim, $267,750 on the breach of contract claim, and $246,261 on the implied contract claim.

punitive damages, id. at 242.  The reasons for the court's various rulings are discussed in detail below.

Both parties appeal.  Incase appeals from the court's judgment as a matter of law on the trade secret and implied contract claims, and the finding of no willful or knowing violation of Chapter 93A.  Timex cross-appeals the failure of the court to enter judgment as a matter of law on the breach of contract claim, and also on the finding of a Chapter 93A violation.  Timex also appeals the denial of its motion for a new trial.

## II. Discussion

### A. Misappropriation of Trade Secrets

We review de novo a district court's grant of a post-verdict motion for judgment as a matter of law.  See Quiles-Quiles v. Henderson, 439 F.3d 1, 4 (1st Cir. 2006).  "Our review is 'weighted toward preservation of the jury verdict' because a verdict should be set aside only if the jury failed to reach the only result permitted by the evidence."  Id. (quoting Crowley v. L.L. Bean, Inc., 303 F.3d 387, 393 (1st Cir. 2002) (emphasis in original)).

To prevail on a claim of misappropriation of trade secrets, a plaintiff must show: 1) the information is a trade secret; 2) the plaintiff took reasonable steps to preserve the secrecy of the information; and 3) the defendant used improper means, in breach of a confidential relationship, to acquire and use

-8-

the trade secret.  <u>Data Gen. Corp.</u> v. <u>Grumman Sys. Support Corp.</u>, 36 F.3d 1147, 1165 (1st Cir. 1994).[10]  In issuing its judgment as a matter of law, the court held that Incase had not presented any evidence that the information was secret or that it had taken reasonable steps to preserve the secrecy of the information.  Timex also argues here that there was no confidential relationship formed between the parties, and that the trade secret was not even the property of Incase in the first place.[11]

The appeal on this claim turns on the second element of the misappropriation cause of action: whether Incase took reasonable steps to preserve the secrecy of the price flag design.[12] The district court noted that no documents were marked

---

[10]Massachusetts also has a statute addressing trade secrets. <u>See</u> Mass. Gen. Laws ch. 93, § 42.  Incase appears not to have brought its claim under the statute, instead relying on the common-law tort of misappropriation of trade secrets.  The statutory and common-law claims may be essentially equivalent.  <u>See</u> <u>Burton</u> v. <u>Milton Bradley Co.</u>, 592 F. Supp. 1021, 1028 (D.R.I. 1984), <u>rev'd on other grounds</u>, 763 F.2d 461, 467 (1st Cir. 1985).

[11]The district court said that the parties had formed a confidential relationship.  It did not address the question of ownership of the information.

[12]Timex also argues that the lack of secrecy protections affects whether the price flag design is a trade secret in the first place.  <u>See</u> <u>Jet Spray Cooler, Inc.</u> v. <u>Crampton</u>, 361 Mass. 835, 282 N.E.2d 921, 925 (1972) (holding that one factor in the analysis of whether information is a trade secret is "the extent of measures taken by the employer to guard the secrecy of the information").  Because Timex raises no other argument against trade secret status, we simply move to the second element, where secrecy is directly on point.  We do not reach the question of whether the price flag design is actually a trade secret.

"confidential" or "secret"; there were no security precautions or confidentiality agreements; Incase had not told Timex the design was a secret; and Incase's principal designer on the project, Bob Shelton, did not think the design was a secret.  Timex adds that Frank Zanghi, Incase's vice president, did not tell anyone at Timex that the design was confidential.

Incase argues that the jury could have found evidence of steps to preserve secrecy in the fact that Incase showed the designs only to Timex; the trade practices of the watch packaging industry; and the fact that Timex treated the designs as confidential in its dealings with Yuhing.  It also argues that Shelton's testimony should not have been given the weight it was by the court, since he was speaking for himself, not the company, when he said that he did not believe the design was secret.  Incase also points to other testimony by Shelton where he said that he did not show the work to anyone other than Timex.

After a careful review of the record, we have not found any evidence to support Incase's argument that it took reasonable steps to preserve the secrecy of the price flag design.  Although Frank Zanghi testified, for example, that when Incase works on a project, it is treated as "confidential between Incase and the company," tr. 10/12/05 at 55, that the design is "proprietary" and "our property," id. at 77, and that he believed that the price flag designs were secret, tr. 10/13/05 at 29, he admitted under cross-

examination that this policy was never articulated to Timex, id. at 31.  The fact that Incase kept its work for Timex private from the world is not sufficient; discretion is a normal feature of a business relationship.  Instead, there must be affirmative steps to preserve the secrecy of the information as against the party against whom the misappropriation claim is made.  See J.T. Healy & Son, Inc. v. James A. Murphy & Son, Inc., 357 Mass. 728, 260 N.E.2d 723, 730-31 (1970) (Protecting a trade secret "calls for constant warnings to all persons to whom the trade secret has become known and obtaining from each an agreement, preferably in writing, acknowledging its secrecy and promising to respect it.  To exclude the public from the manufacturing area is not enough.").  Here, there is no evidence that any such steps were taken.  Therefore, we affirm the district court's judgment as a matter of law on the misappropriation of trade secrets claim.

**B. Unjust Enrichment/Implied Contract**

As with the trade secret claim, we review de novo the court's judgment as a matter of law on the implied contract claim, with our review weighted toward preservation of the jury verdict. See Quiles-Quiles, 439 F.3d at 4.

The jury found that a contract should be implied in law for the design work that Incase did on the S-5 and awarded Incase $246,261.  The court disagreed:

> Incase put on evidence as to the length of
> time that it had worked on the design, but

-11-

there was no evidence as to what those services or products were worth. There was evidence as to what Timex had paid to Yuhing in the Philippines for the product, but I don't think that's a fair measure of the damage to Incase for its design services and prototype services; and I did not see how the jury award matches the evidence. The jury doesn't need perfect information, and its damages awards do not need to be precise as to the penny in this regard, but neither can it speculate or conjecture as to the damages, and I don't see that there was evidence here as to those damages.

Initially somewhat confused itself by how the jury reached this particular figure, Incase now points on appeal to what it believes to be the source. It argues that the jury reached its conclusion by multiplying 3,569,000 (the number of S-5 units that Timex purchased from Yuhing) by 6.9 cents--which yields exactly $246,261. The 6.9-cent figure comes from the testimony of Walter G. Frick, the president of Incase. Frick testified that Incase's selling price for the S-5 would have been 14.5 cents per unit, which would have yielded a profit to Incase of 9 cents per unit. During cross-examination, however, Frick essentially conceded that 12.5 cents per unit was a more accurate selling price. Frick testified that, using 12.5 cents rather than 14.5 cents, the profit-per-unit would come out to 6.9 cents rather than 9 cents. The jury appears to have credited this testimony.

With the source of the calculation established, we turn to the question of whether that source was proper. Timex argues that this is a lost-profits calculation, when only a value-of-

services calculation is appropriate. Under Massachusetts law, a quasi-contract may be implied in law to remedy the unjust enrichment of another party, even where the facts do not necessarily support the existence of an express or implied-in-fact contract. See Bolen v. Paragon Plastics, Inc., 747 F. Supp. 103, 106 (D. Mass. 1990); Salamon v. Terra, 394 Mass. 857, 477 N.E.2d 1029, 1031 (1985). In such a case, the proper measure of damages is quantum meruit, or the reasonable value of services provided. See J.A. Sullivan Corp. v. Massachusetts, 397 Mass. 789, 494 N.E.2d 374, 379 (1986); Salamon, 477 N.E.2d at 1031.

"The question of what [is] fair and reasonable compensation for the services rendered is a question of fact." Guenard v. Burke, 387 Mass. 802, 443 N.E.2d 892, 896 (1982). The jury's award "need not be susceptible of calculation with mathematical exactness, provided there is a sufficient foundation for a rational conclusion." Lowrie v. Castle, 225 Mass. 37, 51, 113 N.E. 206 (1916); see Kitner v. CTW Transp., Inc., 53 Mass. App. Ct. 741, 762 N.E.2d 867, 873 (2002). In a case such as this, where the jury cannot estimate the value of the services from common knowledge, the plaintiff must present evidence of the reasonable value of the services to receive anything more than nominal damages. See Hurwitz v. Parkway Country Club, Inc., 343 Mass. 661, 180 N.E.2d 94, 97 (1962); Driscoll v. Bunar, 328 Mass. 398, 103 N.E.2d 809, 813 (1952). However, the damages may not be based only

-13-

upon lost profits. See J.A. Sullivan Corp., 494 N.E.2d at 379 ("The amount of recovery on a claim based in quantum meruit is the fair and reasonable value of material and labor supplied to the benefiting party."); Restatement (Second) of Contracts §§ 344 cmt. a, 371.

Instead of presenting evidence of the value of its labor and materials and other costs of creating the design, or of the value of the benefit conferred on Timex, see Slawsby v. Slawsby, 33 Mass. App. Ct. 465, 601 N.E.2d 478, 480 (1992), Incase presented evidence only of the profit it would have had if it had won the S-5 manufacturing contract. Incase's task was admittedly difficult, because of its policy of not charging separately for design services. Instead, it uses these services as sales tools to win manufacturing contracts, expecting to recoup the design costs in the profit from those contracts. But assuming that there is some profit on the manufacturing process itself (and some overall corporate profit), the entire expected contract profits cannot reasonably be said to be equivalent to the value of the design services alone. As difficult as it might have been, Incase was obligated to present at least some evidence, even if not precise, as to the actual value of the services provided.

## C. Express Contract

We review de novo a district court's denial of a motion for judgment as a matter of law. Bisbal-Ramos v. City of Mayagüez,

-14-

467 F.3d 16, 22 (1st Cir. 2006). "The verdict must be upheld 'unless the facts and inferences, viewed in the light most favorable to the verdict, point so strongly and overwhelmingly in favor of the movant that a reasonable jury could not have returned the verdict.'" Borges Colón v. Román-Abreu, 438 F.3d 1, 14 (1st Cir. 2006) (quoting Acevedo-Diaz v. Aponte, 1 F.3d 62, 66 (1st Cir. 1993) (internal quotation marks, alterations, and citation omitted)).

Timex argues that no reasonable jury could have found that there was a contract within the Statute of Frauds for six million S-4 units. It says that there was no meeting of the minds by the time of the July 6 purchase order for six million units, which the jury found to be the writing embodying the agreement of the parties, and that we should instead look to the October 26 purchase order for two million units. Timex argues two main points: that the cost of tooling was a material term not yet settled, and that Zanghi admitted that a contract had not yet been finalized at the time of the July 6 purchase order.

In ruling on Timex's motion for judgment as a matter of law, the district court said:

> The price of tooling was not settled at the
> time that agreement was made. The jury could
> have found that the parties agreed that the
> price would not exceed $133,000, the jury
> could have found that the parties agreed to
> negotiate in good faith on the tooling, or the
> jury could have found that the parties agreed
> to leave the term entirely open; but under any

-15-

> of those scenarios, the jury could find
> nonetheless an agreement and a reasonably
> certain basis for granting an appropriate
> remedy under Section 2204 of the Uniform
> Commercial Code; and it is, I think,
> significant that the parties' ultimate
> agreement on the tooling price was $126,000,
> which was less than $133,000.

We agree that a reasonable jury could have concluded a contract was formed despite the fact that final agreement on the tooling cost was reached only later. The July 6 purchase order states, "Tooling cost not to exceed $133,000." Incase was not precluded from attempting to renegotiate this point, which it may have done when it proposed the $153,000 tooling cost on July 21. But in the end, the tooling cost for the S-4 holders came in at $126,000, consistent with the terms of the July 6 purchase order. Therefore, we see no reason to conclude that a reasonable jury would have had to have found that there was no meeting of the minds before July 6.

Timex's argument that there was no contract because of Zanghi's "admissions" also fails. Zanghi testified that, at the end of the May 1998 meeting with Timex officials where the parties reached agreement on terms, he did not believe that they had a "contract." Timex argues that this is the sort of factual admission that should be treated as determinative. See United States v. Parrilla-Tirado, 22 F.3d 368, 373 (1st Cir. 1994). But the question of contract existence is a legal conclusion, not an evidentiary admission. Furthermore, a layman's conception of what constitutes a contract should not determine the legal outcome.

-16-

Many people understand a contract to be the fully drafted and executed written embodiment of the agreement, rather than the agreement itself, something made clear in the following exchange with Timex's counsel:

> Q. And so, the fact that you didn't have a purchase order in May for six million units, you understood, then, you did not yet have a contract with Timex?
>
> A. No. My terminology--I believe I had an agreement with Timex. So your terminology is different. No, I did not have a contract yet.

Therefore, we agree with the district court that there was sufficient evidence for the jury to find that a contract for the S-4 holders existed at the time of the May 1998 meeting, a contract which was then memorialized in the July 6 purchase order.

## D. Chapter 93A

Incase's claim under Chapter 93A was tried before the district court in a bench trial. The court held that Timex had violated Chapter 93A, but had not done so willfully or knowingly, and that thus Incase was not entitled to punitive damages. Incase, 421 F. Supp. 2d at 240-41. The court held further that damages under Chapter 93A would be duplicative of what Incase had already received at trial, and that therefore no additional damages were warranted (though attorney's fees were awarded). Id. at 242-43. Incase now appeals the holding that Timex did not violate the statute willfully or knowingly. Timex appeals the holding that it violated Chapter 93A.

A party will be liable under Chapter 93A if it engages in an "unfair method of competition" or an "unfair or deceptive act or practice." Mass. Gen. Laws ch. 93A, § 11. Here, Incase focuses on the "unfair or deceptive act or practice" prong of the statute. Simple breach of contract is not sufficiently unfair or deceptive to be alone a violation of Chapter 93A. See Commercial Union Ins. Co. v. Seven Provinces Ins. Co., 217 F.3d 33, 40 (1st Cir. 2000). The district court found that Timex's use of the S-5 price flag design, while not misappropriation of a trade secret, was enough of an unfair and deceptive act to turn a garden-variety contract claim into violation of Chapter 93A. Incase, 421 F. Supp. 2d at 240-41. Timex argues that combining the contract and trade secret claims in this way is error. It further argues that, even if combining the two were appropriate, doing so in this case depends on the finding that the S-4 and S-5 units are interchangeable, a finding for which, Timex argues, there is no evidence in the record.

We first address the district court's finding that the S-4 and S-5 were interchangeable. This is a finding of fact, and thus will stand unless clearly erroneous. Commercial Union Ins. Co., 217 F.3d at 40. Timex argues that there is no evidence for this finding, but the district court referred specifically to testimony of Timex representatives who said that the two were essentially fungible products used for the same purpose. See

-18-

Incase, 421 F. Supp. 2d at 237.  Therefore, we see no clear error in the court's finding.

We next address the Chapter 93A ruling itself.  "A ruling that conduct violates [Chapter] 93A is a legal, not a factual, determination."  R.W. Granger & Sons, Inc. v. J & S Insulation, Inc., 435 Mass. 66, 754 N.E.2d 668, 675-76 (2001).  "Although whether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact, the boundaries of what may qualify for consideration as a [Chapter] 93A violation is a question of law."  Schwanbeck v. Federal-Mogul Corp., 31 Mass. App. Ct. 390, 578 N.E.2d 789, 803-04 (1991), rev'd on other grounds, 412 Mass. 703, 592 N.E.2d 1289 (1992).  "'[A] practice or act will be unfair under [Chapter 93A] if it is (1) within the penumbra of a common law, statutory, or other established concept of unfairness; (2) immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to competitors or other business people.'"  Morrison v. Toys "R" Us, Inc., 441 Mass. 451, 806 N.E.2d 388, 392 (2004) (quoting Heller Fin. v. Ins. Co. of N. Am., 410 Mass. 400, 573 N.E.2d 8, 12-13 (1991)).  Which acts will be considered "deceptive" is less clearly defined in the case law.  See Aspinall v. Philip Morris Cos., 442 Mass. 381, 813 N.E.2d 476, 486 (2004).  Some cases have held that an act or practice is deceptive "'if it could reasonably be found to have caused a person to act differently from the way he or she otherwise would have acted.'"

-19-

Id. (quoting Purity Supreme, Inc. v. Attorney Gen., 380 Mass. 762, 407 N.E.2d 297, 307 (1980) (internal quotation marks, citation, and alterations omitted)). The term "goes far beyond the scope of the common law action for fraud and deceit." Slaney v. Westwood Auto, Inc., 366 Mass. 688, 322 N.E.2d 768, 779 (1975).

The district court is not precise about whether Timex's behavior was unfair, deceptive, or both, and the parties similarly do not distinguish between the two kinds of acts. The thrust of the district court's opinion, however, strongly implies that the court's decision stood more on grounds of unfairness than deception. "Through a unique set of circumstances, Timex was able to obtain design services for free, which it used to obtain a lower-cost contract from another supplier, which then led directly to the breach of contract with Incase. Under these circumstances, Timex's acts were unfair and deceptive within the meaning of [C]hapter 93A." Incase, 421 F. Supp. 2d at 240-41.

"In determining whether an act or practice is unfair, as opposed to deceptive, we must evaluate the equities between the parties. What a defendant knew or should have known may be relevant in determining unfairness. Similarly, a plaintiff's conduct, his knowledge, and what he reasonably should have known may be factors in determining whether an act or practice is unfair." Swanson v. Bankers Life Co., 389 Mass. 345, 450 N.E.2d 577, 580 (1980) (internal citations omitted). By August 1999,

-20-

while the contract for the S-4 holders was still in effect, Timex had already decided to move the manufacture of the S-5 holders, with the Incase-designed price flag, to Yuhing, and subsequently used those S-5 units to replace the S-4 units it had not yet ordered from Incase. Timex describes the district court's holding as a "hybrid form of liability" fashioned from a "garden variety . . . breach of contract and a failed misappropriation claim." In doing so, Timex misunderstands the court's ruling and the nature of Chapter 93A. Because a mere breach of contract is not sufficient to establish a violation of 93A, almost any successful 93A claim based in part on a contract violation will be a "hybrid" with some other bad act. Furthermore, the district court was not merely linking two unrelated claims; the court drew a direct line between the unethically procured free design services and the subsequent breach of the S-4 contract. This is sufficiently unscrupulous to sustain a Chapter 93A claim.

Incase claims that the act was not merely unfair, but was willfully and knowingly so. The district court disagreed, but did not articulate its reasons. Incase, 421 F. Supp. 2d at 242. The cases, again, are unclear about what constitutes willful or knowing behavior, but most of them tend to cluster around findings of: (a) coercion or extortion, see Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 583 N.E.2d 806, 822 (1991) (withholding monies owed as a form of extortion is willful); Pepsi-Cola Metro.

Bottling Co. v. Checkers, Inc., 754 F.2d 10, 18 (1st Cir. 1985) (withholding payment as a wedge to enhance bargaining power is willful); (b) fraud and similar forms of misrepresentation,[13] see Datacomm Interface, Inc. v. Computerworld, Inc., 396 Mass. 760, 489 N.E.2d 185, 197 (1986); Serv. Publ'ns, Inc. v. Goverman, 396 Mass. 567, 487 N.E.2d 520, 578 n.13 (1986); see also Computer Sys. Eng'g, Inc. v. Qantel Corp., 740 F.2d 59, 67-68 (1st Cir. 1984) (a willful or knowing violation includes "a misrepresentation made with reckless disregard as to its truth or falsity"); or (c) abusive litigation, see Fed. Ins. Co. v. HPSC, Inc., 480 F.3d 26, 37 (1st Cir. 2007); Int'l Fid. Ins. Co. v. Wilson, 387 Mass. 841, 443 N.E.2d 1308, 1318 (1983).

There was no evidence presented of coercion, fraud, abusive litigation, or similar behavior by Timex, and thus we find no error in the district court's decision to withhold punitive damages.

**E. New Trial Motion**

We review a district court's denial of a motion for a new trial for abuse of discretion. Klonoski v. Mahlab, 156 F.3d 255, 274 (1st Cir. 1998). Timex argues that it was unfair and prejudicial for Incase to alter its damages theory close to the start of trial, and that the district court's denial of its motion

---

[13]This is distinguished from negligent misrepresentation, which is sufficiently deceptive to be a basis for a 93A claim. Glickman v. Brown, 21 Mass. App. Ct. 229, 486 N.E.2d 737, 741 (1985).

for a new trial based on this "unfair surprise" amounted to an abuse of discretion. Incase responds that it was forced to make the change, because the district judge had strongly implied at a Daubert[14] hearing seven days prior to trial that he was not likely to allow the then-current expert estimate of damages.

Both parties are somewhat off the mark. Timex and Incase each address Incase's change from an estimate of 18,000,000 price flags that Incase would have produced to 3,569,000 units. In doing so, they conflate the S-4 express contract claim, the misappropriation of trade secrets claim, and the S-5 unjust enrichment/implied contract claim. Because the latter two are not at issue, we address only the damages testimony concerning the S-4 units.[15]

As we read the evidence, there was no change in the number of units used to estimate damages--it was always 3,328,500,[16] the difference between the 6,000,000 units Timex contracted to purchase and the 2,731,500 it actually did purchase. Compare app. at 1068 with app. at 1079. The only figures in the damages calculation that changed significantly were the unit price and the

_____

[14]Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993).

[15]To the degree that Timex is also arguing the "unfair surprise" of Incase changing its damages calculations with respect to the trade secret and implied contract claims, that argument is moot.

[16]The unpurchased S-4 units numbered 3,328,500. The purchased S-5 units from Yuhing numbered 3,569,000.

-23-

machine labor cost.[17]  Compare app. at 1081 with app. at 1079.  In
the later calculation, machine labor cost was cut by three-
quarters, presumably because the earlier calculation neglected to
consider that a laborer was operating four machines, rather than
one.[18]  The unit price went up to correspond with changes in
Incase's pricing during the course of the contract.  Incase
calculated that Timex's reduced pace of purchasing would cause
prices to go up.[19]  Incase argued below that Timex had agreed to
this change and had purchased units at the new, higher price.

Timex does not attack the validity of the unit price
figure or the pricing schedule, nor does it raise any issues
related to contract modification.  Furthermore, it does not
directly challenge the court's decision to allow the evidence of
the higher prices.  It appeals only the denial of a new trial based

---

[17]Timex claims that the actual method of calculating lost
profits changed as well, with the later calculation not subtracting
fixed costs.  We see no evidence of this.  The breakdowns at
appendix pages 1079 and 1081 show the same method: unit price, less
material costs, machine labor cost, machine direct overhead, and
inefficiency costs, to reach a gross profit figure.

[18]Neither party discusses this figure, and therefore we focus
on the unit price.

[19]The earlier damages calculation had used the unit prices from
the July 6 purchase order.  But on August 22, 2000, Incase informed
Timex that the prices under their contract would have to increase
because Timex had not kept pace with its promised 2,000,000 units
per year.  The prices were increased from 11 (large units) and
10.75 (small) cents per unit to 14.75 and 14.5 cents per unit,
respectively.

on the "unfair surprise" of moving from the (roughly) 10-cent figure to the 14-cent figure several days before trial.

As the district court noted, this "was certainly not a model of how these issues should be handled." But all that was at issue is a change in one variable in a relatively simple formula. Timex had ample opportunity to cross-examine Frick, the witness who presented the testimony, and to argue to the jury that the purchase order price, not the later modification, was the correct number to use. In this context, we do not see any surprise that is "inconsistent with substantial justice." Perez-Perez v. Popular Leasing Rental, Inc., 993 F.2d 281, 287 (1st Cir. 1993) (quoting Conway v. Chem. Leaman Tank Lines, Inc., 687 F.2d 108, 111-12 (5th Cir. 1982) (internal quotation marks omitted)).

### III. Conclusion

For the forgoing reasons, we **affirm**.