# United States Court of Appeals
## For the First Circuit

Nos. 24-1494, 24-1500, 24-1586

ZIPBY USA LLC; TMA GROUP OF COMPANIES LIMITED;
TMA CAPITAL AUSTRALIA PTY LTD,

Plaintiffs, Appellees/Cross-Appellants,

v.

GREGORY PARZYCH,

Defendant, Appellant/Cross-Appellee.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Indira Talwani, U.S. District Judge]

Before

Montecalvo, Kayatta, and Aframe,
Circuit Judges.

Kenneth N. Thayer, with whom Daniel Walsh-Rogalski and Conn
Kavanaugh Rosenthal Peisch & Ford, LLP were on brief, for
appellant/cross-appellee.

John J. Cotter, with whom Brandon R. Dillman, Joshua N.
Andrews, and K&L Gates LLP were on brief, for appellees/cross-
appellants.

March 19, 2026

**KAYATTA**, <u>Circuit Judge</u>. Gregory Parzych was serving as president of a parking technology company called ZipBy USA, LLC, ("ZipBy") when he learned of an opportunity for the company to acquire his former business, a company called TCS. Parzych advised ZipBy's owner to turn down the opportunity, and ZipBy's owner did so. Parzych then attempted to acquire TCS for himself. When ZipBy and its affiliates[1] found out what Parzych was up to, they fired him. ZipBy also sued Parzych, asserting fiduciary-duty, contract, trade-secret, trademark-infringement, and false-designation claims and seeking compensatory and injunctive relief. After a six-day trial, the jury returned a verdict against Parzych on all counts. The district court subsequently found that the evidence could not support the verdict against Parzych on the trade-secret claims. It otherwise rejected Parzych's challenges to the verdict, entered a permanent injunction barring Parzych from acquiring TCS, and awarded ZipBy a portion of its attorneys' fees incurred in the litigation. Parzych now appeals, and ZipBy cross appeals the set-aside of its verdict on its trade-secret claims.

For the reasons explained below, we affirm the judgment of the district court.

---

[1] Those affiliates are TMA Group of Companies Limited and TMA Capital Australia PTY LTD.

We begin with the facts. ZipBy hired Parzych as its president in 2016. Parzych was no stranger to the world of parking technology: He previously founded parking company TCS, then sold it to another company, Q-Free International ("Q-Free"), in 2012. Over the course of his employment, Parzych entered into three agreements with Zipby. The first, the Employee Agreement, included a restrictive covenant under which Parzych agreed not to "undertake any outside activity . . . that could reasonably give rise to a conflict of interest or interfere with his duties and obligations to [ZipBy]," nor to divert business from ZipBy or interfere with its relationships with any service or product-providers. The second agreement, the Employee Handbook, required Parzych to "prevent revealing or divulging" trade secrets or protected confidential information regarding ZipBy's business except as "necessary . . . in the performance of [his] duties or as required by law."

The third agreement, the IP Agreement, forbade Parzych from using or disclosing "trade secrets, proprietary data and confidential information" while in ZipBy's employ and thereafter. The IP Agreement stated that while employed by ZipBy, Parzych was "expected to devote his energy and skills to the promotion of the best interests of the Company." It further required Parzych to safeguard "Confidential Information" that he acquired and

prevented him from "us[ing] such Confidential Information in any way or in any capacity other than as an employee of the Company and to further the interests of the Company and Related Companies." It provided that, should Parzych breach or threaten to breach its provisions, ZipBy could bring suit for injunctive relief and that "the substantial and irreparable harm" from any such breach was "impossible to ascertain in advance," but "monetary damages . . . would be wholly inadequate" as a remedy. Finally, it contained a fee-shifting provision, which we describe below.

In January 2020, Parzych learned that Q-Free was considering selling TCS. Parzych informed Anthony Karam, ZipBy's owner, and Karam asked Parzych to investigate the opportunity. Parzych requested and received financial information from Q-Free about TCS. From there, the parties' accounts diverge: ZipBy claims that Parzych advised Karam not to acquire TCS, while Parzych claims that he and Karam "both expressed concerns" about the acquisition. Given the verdict, we must presume that the jury sided with ZipBy's account. ZipBy's board then voted not to move forward with the acquisition. Two weeks later, unaware of the ZipBy board's decision, Q-Free sent Parzych a proposed nondisclosure agreement between ZipBy and Q-Free in connection with the possible sale of TCS. Rather than executing the agreement for ZipBy, Parzych executed it on behalf of a separate shell company that he owned, MJP Global Technologies. With the

financial data previously disclosed by Q-Free in hand, Parzych began considering whether to re-acquire TCS on his own.

When ZipBy discovered that Parzych was attempting to purchase TCS himself, it fired him. ZipBy then sued Parzych, seeking damages and an injunction preventing Parzych from acquiring TCS for himself.

After a five-day trial, the jury returned a verdict in ZipBy's favor. It awarded ZipBy $1.5 million in compensatory damages on claims of breach of fiduciary duty, breach of contract, and misappropriation of trade secrets, and $1 million in exemplary damages for misappropriation of trade secrets. Unhappy with this outcome, Parzych moved for a new trial under Federal Rule of Civil Procedure 59, a new trial on damages, and judgment as a matter of law under Federal Rule of Civil Procedure 50(b).

The district court granted Parzych's motion for judgment as a matter of law in part, holding that the evidence did not support a finding that Parzych misappropriated trade secrets. The court struck the $1 million in exemplary damages on that basis.[2] Otherwise, it rejected Parzych's challenges.

---

[2] The court left the compensatory damages intact, however, because it found that "evidence as to damages from Parzych's breach of contract and breach of fiduciary duty [was] entirely contiguous with any damages from the alleged trade secrets misappropriation." Parzych does not challenge this determination on appeal.

Parzych now appeals, while ZipBy cross appeals, contending that the district court was wrong to vacate the jury's verdict that Parzych misappropriated ZipBy's trade secrets.

## II.

We begin with Parzych's evidentiary challenges. We review a district court's decision to admit or exclude evidence for abuse of discretion. Gen. Elec. Co. v. Joiner, 522 U.S. 136, 141 (1997).

## A.

Parzych first contends that the district court erred by permitting ZipBy's expert witness, William Scally, to testify about the profits ZipBy lost by not acquiring TCS. Scally's testimony was unreliable, Parzych argues, because it was the product of flawed financial projections. And its admission constituted an error of law, he claims, because lost profits are not the proper measure of damages for a misappropriated corporate opportunity. We assess these arguments in turn.

## 1.

To admit expert witness testimony, a district court must find that "it is more likely than not that" the proposed testimony meets the admissibility requirements of Federal Rule of Evidence 702. Fed. R. Evid. 702. An expert must be "qualified" in terms of "knowledge, skill, experience, training, or education," and must possess "specialized knowledge" that "will

- 6 -

help the trier of fact to understand the evidence or to determine a fact in issue." Id. The expert's opinion must be "based on sufficient facts or data," and it must be "the product of reliable principles and methods." Id.

In Daubert v. Merrell Dow Pharmaceuticals, Inc., the Supreme Court held that scientific testimony must be both "relevant" and "reliable" to be admissible. 509 U.S. 579, 589 (1993). The Court later clarified that these requirements are not limited to scientific evidence; instead, they "appl[y] to all expert testimony." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999). Trial courts thus operate as "gatekeeper[s]," ensuring that proffered expert testimony is more likely than not both "relevant" and "reliable." Lawes v. CSA Architects & Eng'rs LLP, 963 F.3d 72, 97 (1st Cir. 2020). This gatekeeping function "is essential because just as jurors may be unable, due to lack of specialized knowledge, to evaluate meaningfully the reliability of scientific and other methods underlying expert opinion, jurors may also lack the specialized knowledge to determine" or to assess "whether the conclusions of an expert go beyond what the expert's basis and methodology may reliably support." Fed. R. Evid. 702 advisory committee's note to 2023 amendments. That being said, "Daubert does not require that a party who proffers expert testimony carry the burden of proving to the judge that the expert's assessment of the situation is correct." Lawes, 963 F.3d

at 99 (quoting <u>Milward</u> v. <u>Acuity Specialty Prods. Grp.</u>, 639 F.3d 11, 15 (1st Cir. 2011)). What matters instead is that the party offering the expert testimony "demonstrate[] to the court that it is more likely than not that" the Rule 702 requirements are satisfied. Fed. R. Evid. 702.

Parzych argues that Scally's lost-profits testimony was based on unreliable and insufficient information. In estimating the profits ZipBy might have gained had it acquired TCS, Scally relied in part on financial projections prepared in 2019 by David Radford, Q-Free's Executive Vice President. But those financial projections predated the COVID-19 pandemic. Post-COVID, TCS's actual financial results fell far short of those that Radford had earlier projected, which became clear well before trial; indeed, Radford testified in a pre-trial deposition that his projections ceased to be accurate shortly after they were prepared.

Nevertheless, Scally used those 2019 projections in calculating the profits ZipBy supposedly lost by not acquiring TCS. In so doing, he concluded that, had the acquisition gone forward, TCS would have contributed more to ZipBy's business than either TCS's actual performance, or even its 2019 projection, reflected. Parzych contends that the district court erred by permitting Scally to offer this opinion.

We are not persuaded that the district court abused its discretion by permitting Scally's testimony. To begin, there is

no logical reason why TCS's financial contribution to ZipBy, if ZipBy had acquired it, would have equaled only TCS's actual performance as a standalone company. After all, the record indicates that one reason for the acquisition would have been to exploit synergies between TCS and ZipBy and thereby "dominate" the market. Scally's decision to rely upon projections rather than TCS's actual performance therefore does not render his opinion inadmissible for lack of a sufficient factual basis. Furthermore, Scally's calculations did account in some measure for the effects of the pandemic: He explained that he assumed, based on pandemic-related industry changes, a "20 percent dec[rease] . . . as COVID hit," but that was tempered by a balance sheet that, in 2020, reflected more than $500,000 in accounts receivable and a backlog of $3 million in booked business, together with (he opined) an "extraordinarily strong" list of new business opportunities.

This is not to say that we would find Scally's testimony convincing were we the factfinder. His report and direct testimony suggested several potential weaknesses to be probed on cross-examination -- some of which Parzych's counsel tried to explore, albeit without the benefit of any defense expert to challenge Scally. See Lawes, 963 F.3d at 99 ("Vigorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."

(quoting Daubert, 509 U.S. at 596)).  Rather, we simply think that the district court did not abuse its discretion in finding that Scally was qualified to testify and that his opinion was based on sufficient factual information.  Nor was there anything about the reliability of the principles and methods he employed -- or the data as he used it -- that calls into question the court's decision to permit his testimony.  At bottom, Scally and Radford disagreed as to whether Radford's projections would have borne out had ZipBy bought TCS.  Scally offered a sufficiently cogent reason for why he projected "would-have-been" earnings that were greater than TCS's actual earnings.  Importantly, too, this was the type of expert testimony that most jurors could readily understand and evaluate, if challenged appropriately.  It was obvious that Scally projected stronger "but for" performance for TCS than its actual performance; it was clear why he did so, and why one might view the matter otherwise.  Indeed, the jurors pared down Scally's compensatory damage estimate by over one third, even though Parzych presented no opposing expert testimony.  Daubert makes no "demand" that expert testimony be "unassailable."  United States v. Mooney, 315 F.3d 54, 63 (1st Cir. 2002); cf. Crowe v. Marchland, 506 F.3d 13, 18 (1st Cir. 2007) (observing that objections to the "factual underpinnings of an expert's investigation" tend to "go to the weight of the proffered testimony, not to its admissibility").  We therefore hold that the court did not abuse its discretion in

finding that Scally's testimony satisfied the Rule 702 admissibility requirements because it was based on "sufficient facts or data" to which an undisputedly qualified expert applied "reliable principles and methods."  Crowe, 506 F.3d at 17 (quoting Fed. R. Evid. 702).

**2.**

Parzych also argues that admitting Scally's testimony amounted to an error of law because he testified to ZipBy's lost profits, but -- Parzych argues -- lost profits were not a proper measure of damages here.  This is so, he claims, because in a case of stolen corporate opportunity, Massachusetts law only permits restitution of any ill-gotten gains; lost-profit damages are too speculative.[3]

Parzych correctly observes that Massachusetts courts have permitted plaintiffs to recover restitution damages in similar cases.  See Demoulas v. Demoulas Super Mkts., Inc., 677 N.E.2d 159, 195 (Mass. 1997) (stating that when a corporate

---

[3] Parzych argues both that lost profits are too "inherently speculative" to serve as an appropriate measure of damages in lost corporate opportunity cases, and that in this particular case lost profit damages were inappropriate because Scally's opinion was too speculative and no "non-speculative evidence to support ZipBy's purported lost profits" was introduced.  Our holding above that Scally's opinion met Rule 702's requirements, including that it was based on sufficient facts and reliable methods, disposes of the latter argument, and so we address here Parzych's remaining claim that lost profits are always an inappropriate measure of damages in this type of case.

fiduciary profits by violating the duty of loyalty, a court "may properly order restitution" (emphasis added)); see also Hanover Ins. Co. v. Sutton, 705 N.E.2d 279, 293 (Mass. App. Ct. 1999) (affirming restitution award). But Parzych points to no caselaw holding that restitution is the only permissible measure of damages for a lost corporate opportunity. Indeed, in the analogous context of misappropriation of trade secrets, Massachusetts's highest court has ruled that a plaintiff can recover either restitution for a defendant's unjust enrichment or the actual loss caused by the misappropriation. Jet Spray Cooler, Inc. v. Crampton, 385 N.E.2d 1349, 1356 (Mass. 1979). We see no reason why a plaintiff claiming a lost corporate opportunity would not have a similar choice under Massachusetts law.

**B.**

Parzych's next evidentiary argument contends that the district court erred by excluding from evidence TCS's tax returns from the years 2021 and 2022, which showed the company's actual profits and losses. During the final pretrial conference, Parzych's counsel informed the district court -- apparently for the first time -- that she was in the process of subpoenaing those tax returns to use them at trial, in order to discredit Scally's lost-profit testimony and inform the jury's assessment of damages. The court rejected this effort, ruling that it was "too late" for those records to come in and reminding Parzych's counsel the court

would not "play[] surprise."  Parzych contends that this exclusion constituted an improper discovery sanction.

We review a district court's decision to impose a discovery sanction for abuse of discretion.  Gomez v. Rivera Rodriguez, 344 F.3d 103, 112 (1st Cir. 2003).  Federal Rule of Civil Procedure 26 mandates that "[u]nless the court orders otherwise," a party must disclose, at least 30 days before trial, "an identification of each document" that it may present at trial other than those solely for impeachment.  Fed. R. Civ. P. 26(a)(3)(A)(iii).  If a party fails to comply with these obligations, Rule 37 instructs that the party is "not allowed to use that [undisclosed] information . . . at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  To determine whether a district court abused its discretion by precluding evidence under Rule 37, this court considers "an array of factors," including (as relevant here) "the sanctioned party's justification for the late disclosure; the opponent-party's ability to overcome its adverse effects (i.e., harmlessness); the history of the litigation; the late disclosure's impact on the district court's docket; and the sanctioned party's need for the precluded evidence."  Harriman v. Hancock Cnty., 627 F.3d 22, 30 (1st Cir. 2010).

Parzych does not dispute that he first raised the issue of the TCS tax records two years after the conclusion of fact

discovery and only seven days before trial.  See Fed. R. Civ. P. 26(a)(3)(B).  Nor does he dispute that the parties agreed to produce, by July 10, 2023, "any document they may introduce or rely on at trial that ha[d] not previously been produced."  He argues, however, that his late disclosure was justified, because (1) the 2021 and 2022 tax returns did not yet exist in 2020, when ZipBy served its discovery requests; and (2) TCS, not Parzych, possessed the documents.  But Rule 26(e) requires a party to supplement his initial responses to discovery requests, and Parzych does not explain why he could not obtain the 2021 and 2022 tax returns until November 2023.  Nor, in this instance, does it matter that the records were in TCS's possession, because Parzych offers no justification for his decision to wait until the eve of trial to seek documents that he knew existed.

We are similarly unpersuaded by Parzych's argument that his late disclosure was a "harmless inconvenience."  See Harriman, 627 F.3d at 31.  By introducing the tax returns for the first time at the final pretrial conference, Parzych would have deprived ZipBy of the opportunity to conduct any additional discovery necessary to challenge their contents or probative value.  Nor are these considerations outweighed by Parzych's need for the tax returns because, as Parzych acknowledges, the records would merely have "confirmed" what Radford intended to testify -- that TCS was less profitable than Scally claimed it would have been.

As we have previously observed, pretrial disclosure "make[s] a trial less a game of blindman's buff and more a fair contest with the basic issues and facts disclosed to the fullest practical extent." Thibeault v. Square D Co., 960 F.2d 239, 244 (1st Cir. 1992) (quoting United States v. Procter & Gamble Co., 356 U.S. 677, 682 (1958)). We see no abuse of discretion in the district court's decision to exclude the tax returns as simply coming too late.

**III.**

Having rejected Parzych's evidentiary challenges, we turn now to his argument that the district court abused its discretion by denying his request to continue the trial when his lead counsel, Michelle Blair, contracted COVID-19.

Early on the fourth day of the six-day trial, Blair informed the court that she had tested positive for COVID-19. After some discussion, Blair and the district court agreed that Blair would participate remotely, with Blair stating that she didn't "want to risk losing . . . the jury." Later, however, and before the jurors arrived, Parzych's other attorney, Robert Dionisi, informed the court that Parzych was "very uncomfortable going forward without Attorney Blair in the courtroom." The district court explained that delaying the trial might mean "los[ing] the full jury." In response, Dionisi suggested that the

court "go forward" with the testimony planned for that day, then continue the trial for Blair's five-day quarantine period.

With two suggestions on the table, the district court reserved judgment, and instead polled the jury about the impact of a continuance. The jury informed the court that it "would like to continue working here" rather than postpone the trial.

Neither party voiced any formal objection to the district court's subsequent decision to proceed with the trial. Parzych did not move for a mistrial. Blair continued to participate remotely during the last two days of the trial, and co-counsel Dionisi participated in person. While Blair proceeded remotely, Dionisi cross-examined plaintiffs' expert witness and conducted the direct examination of the defense's witness. Blair conducted the direct examination of Parzych via Zoom. Prior to the parties' closing arguments, the court offered Blair the choice to conduct her closing argument in person, with a mask. Blair rejected the proposal and elected to proceed via Zoom.

After the verdict, Parzych moved for a new trial on the grounds that the district court erred by proceeding with the trial without the suggested hiatus. The district court denied this motion, finding that Parzych waived this claim by failing to formally object to the remote-participation plan and failing to raise any formal or informal objections to Blair's remote participation during days four, five, and six of trial. It further

found that Parzych was "ably represented by counsel throughout the trial."

Sidestepping the question of waiver, we affirm on the merits. "Trial management is peculiarly within the ken of the district court," and the district court has "broad discretion to grant or withhold continuances." United States v. Saccoccia, 58 F.3d 754, 770 (1st Cir. 1995). For that reason, a court denying a continuance abuses its discretion only when it shows "an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay." Id. (quoting Morris v. Slappy, 461 U.S. 1, 11-12 (1983)). In reviewing the decision to deny a continuance, we "look first at the reasons contemporaneously presented in support of the request for the continuance," and then we may consider factors such as "the extent to which the movant has contributed to his perceived predicament," "the probable utility of a continuance," "the extent of inconvenience to others (such as the court, the witnesses, and the opposing party)," and "the likelihood of injustice or unfair prejudice." Id.

Parzych argues that this is the rare case in which the district court abused its discretion by proceeding with the trial, because in his view, the court arbitrarily prioritized the jury's scheduling preference over the prejudice caused to Parzych. Blair's remote participation could have impaired her effectiveness. But Parzych offers no example of any such

impairment.[4]  Blair herself rejected the opportunity to conduct closing arguments in person with a mask, opting to do so via Zoom instead.  The half-hearted expression of a preference for a continuance rather than a motion or objection, even if not a full waiver, suggests that no one seemed to think at the time that what the court did was unreasonable or unfair.  And indeed, the district court found that Parzych was fully and capably represented by both an in-person advocate (Dionisi) and an advocate participating virtually (Blair).  There was no abuse of discretion here.

**IV.**

We turn now to ZipBy's arguments on cross appeal.  ZipBy argues that the court erred by overturning the jury's verdict finding that Parzych misappropriated ZipBy's trade secrets under both Massachusetts law and the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836.  We review de novo a district court's decision to grant judgment as a matter of law.  Sharp v. Hylas Yachts, LLC, 872 F.3d 31, 43 (1st Cir. 2017).  Our review is "weighted toward preservation of the jury verdict," and we must sustain that verdict

---

[4]  Parzych points instead to generic concerns regarding the efficacy of "trial by Zoom."  But he offers no concrete examples of any particular prejudice he suffered as a result of Blair's virtual participation coupled with Dionisi's in-person participation.  He argues, for example, that Blair could not observe the jury during her examination of Parzych in order to adjust her style but does not point to any moment where such an adjustment would have been necessary, nor explain why -- in the face of any such concern -- Dionisi did not conduct his direct examination instead.

"unless the evidence was so strongly and overwhelmingly inconsistent with the verdict[] that no reasonable jury could have returned [it]." Crowley v. L.L. Bean, Inc., 303 F.3d 387, 393 (1st Cir. 2002) (quoting Rodowicz v. Mass. Mut. Life Ins. Co., 279 F.3d 36, 41-42 (1st Cir. 2002)). Even under this demanding standard, we think the district court was right to strike the jury's verdict on ZipBy's state and federal trade-secret claims.

The district court reasoned that "[t]he standard[s] for misappropriation" under Massachusetts law and the DTSA are "substantially similar" and treated them as such. ZipBy USA LLC v. Parzych, No. 20-cv-10926, 2024 WL 1702116, at *4 (D. Mass. Apr. 19, 2024) (quoting Viken Detection Corp. v. Videray Tech. Inc., 384 F. Supp. 3d 168, 177 (D. Mass. 2019)). On appeal, the parties do not argue that Massachusetts law might consider ZipBy's trade-secret claims differently than federal law. Accordingly, "our analysis will draw no distinction between the district court's misappropriation findings under the DTSA and state common law, affirming or reversing them in tandem." Allstate Ins. Co. v. Fougere, 79 F.4th 172, 187-88 (1st Cir. 2023).

Under the federal standard, an entity bringing a misappropriation suit must show that it is the "owner" of a trade secret and that the defendant's use of that secret was without express or implied consent. 18 U.S.C. §§ 1836(b)(1), 1839(5). Under Massachusetts law, "a plaintiff must show that the

- 19 -

information is a trade secret which 'the defendant used improper means, in breach of a confidential relationship, to acquire and use.'"  Allstate Ins. Co., 79 F.4th at 187 (quoting Incase Inc. v. Timex Corp., 488 F.3d 46, 52 (1st Cir. 2007)).

The first subject of ZipBy's trade-secret claim is financial information about TCS, Parzych's old company, that Q-Free provided to Parzych.  Q-Free gave that information to Parzych so that ZipBy could consider an opportunity to acquire TCS from Q-Free.  Parzych used that information in deciding whether and how he should try to acquire TCS for himself.  As the jury found, Parzych's use of the information -- indeed, his acquisition attempt itself -- clearly breached various fiduciary and contractual duties Parzych owed his employer.  However, ZipBy also wants to characterize that behavior as a misappropriation of a trade secret.  It reasons that because it was obligated to keep the information supplied by Q-Free confidential, it was a licensee and therefore an "owner" of the information under 18 U.S.C § 1839(4).  Further, ZipBy contends that as an owner, it regarded the information as a secret.

Whatever one thinks of this argument in the abstract, we agree with the district court that it does not fly on this record. Q-Free certainly had the right, as owner of its own information, to decide to whom it would show that information.  See Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1002 (1984) ("Because of the

intangible nature of a trade secret, the extent of the property right therein is defined by the extent to which the owner of the secret protects his interest from disclosure to others."); Jet Spray Cooler, Inc. v. Crampton, 282 N.E.2d 921, 925 (Mass. 1972) (reasoning that "the extent of measures taken by the employer to guard the secrecy of the information" informs the inquiry as to whether the information alleged to be a trade secret is truly confidential).

While Q-Free may have initially assumed that Parzych would use the financial information for ZipBy's benefit, it was soon obvious to Q-Free that Parzych sought to acquire TCS on his own behalf. There is no evidence that Q-Free complained about that use of its information. Most acquisition-welcoming targets readily provide such information to serious suitors, as the district court recognized in noting that it would have been easy for Parzych to get Q-Free to show him the same documents again independently. Indeed, upon learning of Parzych's intentions to acquire Q-Free for himself, a Q-Free executive responded, "Fine for us. It doesn't matter as long as we know who we deal with." We therefore agree with the district court that any license ZipBy may have had to use Q-Free's financial data did not entitle ZipBy to stand in Q-Free's shoes in deciding whether Parzych could use the data.

ZipBy next argues that the jury could have permissibly found that Parzych misappropriated ZipBy's "internal strategy to forgo the TCS opportunity." But implementing that strategy meant telling Q-Free that ZipBy was not interested in pursuing the opportunity. And ZipBy points to no evidence suggesting that information was to be conveyed to Q-Free in confidence.[5] With ZipBy having taken no measures at all to keep secret its forgoing of a purchase, no jury could properly find that such a "strategy" was a trade secret. See 18 U.S.C. § 1839(3)(A) (requiring, for information to constitute a trade secret, that the owner have taken "reasonable measures to keep such information secret").

In sum, we share the district court's assessment that ZipBy's trade-secret theories try "to put in the box of trade secret[s] something that seems ill fitting" -- a square peg in a round hole. We affirm the district court's decision granting judgment as a matter of law against ZipBy on its trade-secret claims.

**V.**

Finally, we consider Parzych's claim that the district court erred by awarding ZipBy more than $2 million in attorneys'

---

[5] ZipBy points only to evidence that its board minutes were secret, and that Parzych had access to ZipBy's "trade secret information" as a general matter.

fees and $210,000 in expert fees, pursuant to the fee shifting provision in the IP Agreement, which states as follows:

> In the event of any breach or threatened breach of the provisions of this Agreement, the Company shall be entitled to maintain an action for injunctive relief, it being agreed by the parties hereto that the substantial and irreparable harm which the Company would sustain upon any such breach is impossible to ascertain in advance and that the award of monetary damages therefor would be wholly inadequate, and the Employee shall be responsible for the Company's costs and expenses, including without limitation, reasonable attorneys' fees and court costs incurred in enforcing any of the covenants of this Agreement.

We review an award of attorneys' fees for abuse of discretion. See, e.g., Small Just. LLC v. Xcentric Ventures LLC, 873 F.3d 313, 326 (1st Cir. 2017). But mistakes of law "always constitute abuses of a court's discretion," Gay Officers Action League v. Puerto Rico, 247 F.3d 288, 292 (1st Cir. 2001), and insofar as the parties' dispute hinges on the correct interpretation of a contractual provision, that is a question of law that we review de novo, Holsum de P.R., Inc. v. ITW Food Equip. Grp. LLC, 116 F.4th 59, 66 (1st Cir. 2024). Below, the district court applied California law to interpret the IP Agreement in accordance with its choice-of-law provision. On appeal, neither party contests that California law applies. We therefore follow their lead and apply California law to the contract-interpretation issue before us. In re Newport Plaza Assocs., L.P., 985 F.2d 640,

644 (1st Cir. 1993) ("When opposing parties agree to the source of the substantive law that controls their rights and obligations, and no jurisdictional concerns are present, a court is at liberty to accept such an agreement without independent inquiry.").

Parzych argues, first, that the IP Agreement's fee-shifting provision only covered actions seeking an injunction -- not money damages, like those ZipBy sought in this case. But as we read the fee-shifting provision in the IP Agreement between Parzych and ZipBy, it clearly has two relevant effects. It authorizes injunctive relief without specific proof of irreparable harm, and it authorizes the recovery of "reasonable attorneys' fees" by ZipBy "incurred in enforcing any of the covenants of the agreement." This reading disposes of Parzych's argument that the fee-shifting provision only applies to fees incurred by ZipBy in obtaining injunctive relief.

That leaves Parzych's second argument, contending that the fee shifting only applies to fees incurred in enforcing the covenants of the IP Agreement itself and that "litigation fees were not 'incurred in enforcing' [the] Agreement" because the Agreement did not "govern [his] ability to pursue acquiring TCS in potential competition with ZipBy."

The basis on which this case was tried and presented to the jury indicated otherwise. The jurors were instructed without objection that ZipBy claimed that Parzych breached his contracts

by, among other things, "failing to perform his duties faithfully and exclusively for [ZipBy], in violation of . . . Section 1 of the IP Agreement." Section 1 of the IP Agreement states in relevant part that "[w]hile employed by the Company, the Employee is expected to devote his energy and skills to the promotion of the best interests of the Company" and "that it is reasonable and necessary for the protection of the goodwill, trade secrets, proprietary data and confidential information of the Company and Related Companies that [the Employee] undertake the obligations contained in this Agreement regarding his conduct during and subsequent to his employment by the Company." Thus, Parzych's pursuit of TCS was not only a basis for a breach of fiduciary duty claim; it was also a breach of the IP Agreement. And the jury returned a verdict in ZipBy's favor on the claim for breach of the IP Agreement. Given that Parzych has not challenged that verdict, we see no basis for his contention that the fees and costs incurred in litigating his pursuit of TCS were not incurred in enforcing the IP Agreement.

Nor does it matter that some of the same work undertaken in the effort to enforce the IP Agreement also provided needed support for ZipBy's other claims. Under California law, "[a]ttorney's fees need not be apportioned when incurred for representation on an issue common to both a cause of action in

which fees are proper and one in which they are not allowed." Reynolds Metals Co. v. Alperson, 599 P.2d 83, 86 (Cal. 1979).

This is not to say that all fees incurred by ZipBy were incurred in litigating issues common to the breach of contract claim. And we agree with the district court's criticism of ZipBy for failing to produce more details in support of its fee request. Having tried the case, however, the district court had an excellent perspective from which to gauge what was at issue and what efforts were expended on which claims, including the trade-secrets claim that ZipBy lost. The district court was attuned to both the possibility that fees could be awarded for the pursuit of common issues and the limitation on the reach of that possibility under California law. We thus discern no error of law. And the court's ultimate judgment that two-thirds of ZipBy's fees and expenses were incurred in successfully enforcing the IP Agreement seems reasonable based on our own review of the record. So we affirm that award as not an abuse of discretion.

## VI.

For the foregoing reasons, we affirm the district court's judgment in full.