# United States Court of Appeals
## For the First Circuit

No. 22-1258

ALLSTATE INSURANCE COMPANY,

Plaintiff, Appellee,

v.

JAMES FOUGERE, SARAH BRODY-ISBILL, A BETTER INSURANCE
AGENCY, INC. a/k/a ABIA,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Judith G. Dein, U.S. Magistrate Judge]

Before

Gelpí, Lynch, and Thompson,
Circuit Judges.

Timothy K. Cutler, with whom Cutler & Wilensky LLP was on
brief, for appellants.
J. Scott Humphrey, with whom Benesch, Friedlander, Coplan &
Aronoff LLP was on brief, for appellee.

August 29, 2023

**THOMPSON**, **Circuit Judge**.  This appeal arises from a dispute between Allstate Insurance Company ("Allstate") and two of its former agents -- Appellants James Fougere and Sarah Brody-Isbill -- as well as a third Appellant, A Better Insurance Agency, Inc. ("ABIA").  At the heart of this suit are spreadsheets which, according to Allstate, contain trade secrets misappropriated by Fougere and Brody-Isbill in breach of their contracts with it.  A district court agreed and entered summary judgment favoring Allstate against all three Appellants.[1]  On appeal we are asked to review these findings.  Also in the mix are two counterclaims brought by Appellants against Allstate, which the district court dismissed, and which Appellants seek to resuscitate on appeal.

As we consider Appellants' arguments, we first lay out the factual background of this case and from there, consider the district court's sundry legal rulings against Appellants.  Because we conclude the district court committed no error, we affirm each of them in turn.

## I.  Background

In February 2013, Fougere signed an exclusive agency agreement ("EA agreement") with Allstate to sell the company's auto and casualty insurance products in Massachusetts and thereafter began operating an agency in Framingham.  Prior to

---

[1]  For purposes of our analysis, we refer to Fougere, Brody-Isbill, and ABIA collectively as "Appellants."

joining Allstate, Fougere had managed ABIA.  Once his Allstate agency was up and running, Fougere hired Brody-Isbill to work for him.  The following year, in April 2014, Brody-Isbill entered into a separate EA agreement with Allstate, and opened up her own Allstate agency in Auburn, MA.

Under their agreements, Brody-Isbill and Fougere committed to working as "scratch" agents, so named because in this role they were expected to solicit new customers and build new books of business for the company from scratch (as opposed to receiving existing Allstate customers or accounts), in exchange for commissions for the company policies they sold.  The EA agreements sketched out numerous responsibilities for the agents. Among other requirements, the agreements mandated that Fougere and Brody-Isbill exclusively represent Allstate, which meant they were prohibited from directly or indirectly soliciting, selling, or servicing insurance from other insurance companies without Allstate's approval.  Central to this appeal, the agents also committed to maintaining information identified by Allstate as confidential[2] and promised that they would not misuse or improperly

---

[2] According to the EA agreements:
> Confidential information includes, but is not limited to:  business plans of [Allstate]; information regarding the names, addresses, and ages of policyholders of [Allstate]; types of policies; amounts of insurance; premium amounts; the description and location of insured property; the expiration or renewal

disclose the information, they would return the information to Allstate when their agency relationships terminated, and they would not use the information for any improper purpose.

According to Allstate, despite Fougere's financial success, his Allstate agency quickly raised red flags due to its alleged noncompliance with Allstate regulations and Massachusetts state law. Over a year into the contract, in September 2014, an Allstate employee working with both Fougere and Brody-Isbill[3] emailed corporate management claiming that, among several other troubling practices, the two Allstate agents had been commingling business, with Fougere being significantly involved in Brody-Isbill's agency and the two of them sharing confidential Allstate information between their agencies (in violation of their EA agreements, as Allstate sees it). Allstate further claims that Fougere was also sharing this information with two other entities:

> dates of policies; policyholder listings and any policyholder information subject to any privacy law; claim information; certain information and material identified by [Allstate] as confidential or information considered a trade secret as provided herein or by law; and any information concerning any matters affecting or relating to the pursuits of [Allstate] that is not otherwise lawfully available to the public.

[3] In his email, the employee described himself as an Allstate licensed sales producer who had "been working under [Fougere and Brody-Isbill] as a Sales Manager and Training Specialist for all of their new hires."

- 4 -

ABIA and an organization named Thumbs Up Marketing, Inc. ("Thumbs Up"), which Fougere formed after becoming an Allstate agent. Allstate describes Thumbs Up as another insurance agency.[4]

Much of what followed once Allstate's concerns surfaced is disputed by the two parties,[5] and largely immaterial to this appeal, but suffice it to say that in November 2014, Allstate terminated its EA agreement with Fougere. Then, in October 2015, the company did the same with Brody-Isbill's agreement.[6] With the terminations, Allstate cut off each former agent's access to the company's online electronic records portal and collected any

---

[4] Appellants later (when opposing Allstate's motion for summary judgment, submitted after the company filed suit) deny these claims of wrongdoing and insist that the common link, Thumbs Up, was a marketing company that bought and sold leads for the insurance agencies. They maintain, as Fougere testified when being deposed, that Thumbs Up did not blur the lines between the two agencies, and solely "directed leads to the different agencies" that the organizations would receive separately, on a queue system.

[5] According to Allstate, after launching an investigation into Fougere, the company found practices that gave Allstate grounds to terminate his EA agreement for cause. Fougere denies any wrongdoing, and claims that he was terminated by Allstate in retaliation for raising, to Allstate corporate management, what he claims were numerous violations of Massachusetts insurance laws and regulations by the company.

[6] The parties similarly dispute the terms of Brody-Isbill's termination. Allstate contends that, following Fougere's termination, the company cautioned her to bar Fougere from playing a role in her agency and advised her about unacceptable business practices more broadly. According to the company, compliance issues at her agency continued, resulting in her termination. Brody-Isbill denies that she received warnings from Allstate and that she failed to comply with required business practices.

physical files located in their Allstate agency offices.

Central to this dispute is Allstate's contention that, after terminating their EA agreements, Fougere and Brody-Isbill breached their contractual requirement to, post-termination, return all confidential information to Allstate and refrain from using any of it in the future.[7] In November 2015, Allstate, through counsel, sent a letter to Fougere stating that it had reason to believe he had retained confidential information belonging to Allstate, and had been using it to solicit Allstate customers on behalf of ABIA. Fougere's attorney responded with a letter denying the allegation, reassuring all that Fougere had not utilized any confidential information to solicit clients, and guaranteeing that the former agent would "continue to respect and not disclose any confidential information of Allstate[.]"

Several of Fougere's former employees, this time ones who had worked under him at ABIA, contradicted this account. In

---

[7] Under their EA agreements, Fougere and Brody-Isbill also agreed that they would not solicit the purchase of products or services in competition with those sold by Allstate for one year following their respective terminations. Appellants represent, and Allstate does not expressly challenge, that Fougere waited out this period before reentering the insurance business, and both parties are silent on the extent to which Brody-Isbill complied with this contractual term.

The agreements also provided that while the agents, following termination, might sell their economic interest in any Allstate customer accounts they developed, Allstate "retain[ed] the right in its exclusive judgment to approve or disapprove such a transfer."

July 2016, three former ABIA employees emailed Allstate that Fougere had confidential information for thousands of Allstate customers, and that he had been directing his agents to contact those customers.[8] From there, the former employees more specifically alleged that Fougere had given his ABIA agents access to files, on a restricted Google Drive, named "Framingham Allstate book of business" and "Allstate Auburn book of business," which included the "names, addresses, phone numbers, email addresses, renewal dates, types of insurance policies, and premiums paid by insurance customers." According to the former employees, Fougere had directed ABIA employees to solicit the customers contained within the spreadsheets, and had acknowledged, in Brody-Isbill's presence, that the files were retained from both of their former Allstate insurance agencies. After making additional allegations about Fougere and Brody-Isbill misusing Allstate's confidential

---

[8] The email was sent under a fake name and claimed that Fougere had "over 5000 customers on a list with all their information and phone numbers from [A]llstate," and that Fougere "has his agents call out to these customers" and solicit their business. The three former ABIA employees -- Kevin Gabbet, Jonathan Anderson, and Brian Plain -- unmasked, subsequently submitted affidavits alleging Fougere and Brody-Isbill misused confidential information from their former Allstate agencies in the course of conducting business for ABIA. By this point, the former ABIA employees had started their own insurance agency, Premier Shield, which had settled its own separate lawsuit with ABIA.

For their part, Appellants (in their opposition to Allstate's summary judgment request) claimed that the affidavits were drafted by Allstate's counsel, and, without elaboration, disputed "the truthfulness of the statements."

information, the former ABIA employees forwarded copies of portions of spreadsheets entitled "Framingham Allstate book of business" and "Allstate Auburn book of business" to Allstate, which they claim contained information verifying their assertions.

### Allstate's Suit Against Appellants

Weeks later, in August 2016, Allstate filed suit against Fougere and Brody-Isbill, and soon after, amended its complaint to include ABIA as a defendant.[9] Allstate's operative pleading brought breach of contract and trade secret claims (alleging trade secret misappropriation under both common law and the Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836) against Fougere and Brody-Isbill; DTSA and tortious interference with advantageous business relationship claims against ABIA; and claims against all three Appellants for unfair competition in violation of Mass. Gen. Laws ch. 93A.

For their part, the three defendants denied wrongdoing,

_____

[9] Because the events that gave rise to this amendment are disputed, we do not dwell on them. But according to Allstate, in the course of a voluntary meeting at ABIA's office, Allstate's counsel asked to view ABIA's Google cloud computing folder where Allstate believed the spreadsheets were being stored. After nothing turned up, counsel asked to see the "trash" folder, where, according to Allstate, the "Allstate" files appeared -- prompting the company to amend its complaint to bring claims against ABIA. Allstate brought a motion for sanctions for destruction of evidence, which was subsequently withdrawn. Appellants deny this account and claim that "[a]ll sets of the spreadsheets were voluntarily identified by Mr. Fougere when he invited Allstate to ABIA's office at the commencement of the action to view his computers."

listed numerous affirmative defenses, and filed counterclaims of their own. They alleged that Allstate had breached Fougere's and Brody-Isbill's contracts, violated Mass. Gen. Laws ch. 175, § 163 by failing to provide adequate notice before their terminations, violated Mass. Gen. Laws ch. 175, § 162F by misappropriating information that belonged to them, wrongfully interfered with Fougere's contractual relations, and violated Mass. Gen. Laws ch. 93A by engaging in bad faith business practices.

A few weeks later, the parties filed a joint motion requesting the court enter an agreed-upon preliminary injunction. The court did so in November 2016, entering a stipulated order under which Appellants were "enjoined from, directly or indirectly, accessing, using, possessing, or having access to Allstate Confidential Information" and using or accessing four documents contained on Fougere's or ABIA's databases entitled TU Framingham, TU Auburn, Allstate Framingham, and Allstate Auburn.

In the course of discovery, Allstate requested and the court ordered a forensic examination of Appellants' electronic systems, databases, and servers. Through the order, Allstate was granted permission to take and retain screenshots of the four spreadsheets identified in the preliminary injunction. However, by the time the forensic exam was finally conducted, two of the "Allstate" documents -- Allstate Framingham and Allstate Auburn -- had been permanently deleted.

Nonetheless, Allstate was able to procure screenshots of TU Framingham and TU Auburn, both of which closely matched Allstate's audits of Fougere's and Brody-Isbill's books of customer information while they were still with the company. According to Allstate, of the 35 names in the TU Framingham screenshot, 34 were Allstate customers affiliated with Fougere's agency prior to his termination. Allstate found similarly for 22 of the 29 customers listed in the TU Auburn screenshot, who had been with Brody-Isbill's agency before her termination. While Appellants quibbled over the validity of these comparisons,[10] they ultimately produced the full TU Framingham and TU Auburn spreadsheets ("the spreadsheets") and eventually conceded that they "each contain the names of thousands of Allstate customers, along with their renewal dates, premiums, types of insurance, Allstate policy numbers, driver's license numbers, home addresses, phone numbers, and email addresses."

Following the close of discovery, both sides filed

---

[10] After the close of discovery, in their opposition to Allstate's statement of facts for summary judgment, Appellants questioned the authenticity of Allstate's audits of their former Allstate agencies. Without challenging the substance of the comparisons, they argued that "[n]one of Allstate's witnesses could authenticate the audit. None of [the] witnesses knew who did the audit, what the parameters of the audit were, when it was done or how it was done." While Appellants continue this line of arguments on appeal, they do not present any substantive challenges to the audit or screenshots, nor do they indicate how this should materially alter the summary judgment analysis.

- 10 -

partial motions for summary judgment, which were granted to Allstate and denied for Appellants. The court determined that the spreadsheets retained by Appellants constituted confidential and trade secret information belonging to Allstate, and accordingly granted summary judgment, as to liability, on the company's breach of contract and misappropriation of trade secrets claims against Fougere and Brody-Isbill, as well as its DTSA claims against both them and ABIA.[11] The court also found in favor of Allstate on each of Appellants' counterclaims, dismissing them accordingly.

After the court's summary judgment decisions, Appellants moved the court to reconsider based on what they described as an intervening change of law. As they saw it, the court's trade secret rulings were in conflict with a decision issued by this court shortly after the district court's order, TLS Mgmt. & Mktg. Servs., LLC v. Rodríguez-Toledo, 966 F.3d 46 (1st Cir. 2020). The district court disagreed and denied the motion.

In the wake of these favorable rulings from the court, Allstate opted to dismiss its remaining claims -- for tortious interference and unfair competition -- against Appellants, as well as those for actual damages. Allstate instead sought and received

---

[11] Though not relevant to the issues before us today on appeal, we note that the court also granted Appellants' motion to strike certain representations made by Allstate's attorney, denied Appellants' motion to disqualify the attorney, and denied Allstate's motion for sanctions filed in response to Appellants' disqualification motion.

nominal damages amounting to $2.00 for both of its contract claims, as well as an award of attorneys' fees from Fougere and Brody-Isbill. Finally, the court granted Allstate's request to convert the preliminary injunction entered against Appellants into a permanent one, enjoining them from using, processing, or having access to Allstate confidential information.

Appellants timely filed this appeal challenging the district court's rulings below. Before us, they argue that the district court erred when it granted Allstate summary judgment on Appellants' counterclaims under Mass. Gen. Laws ch. 175, § 163 and ch. 93A, did the same on the company's breach of contract and trade secret claims against Fougere and Brody-Isbill, denied Appellants' request to reconsider its trade secret rulings, issued a permanent injunction against all three Appellants, and awarded attorneys' fees to Allstate. Appellants also challenge the district court's DTSA ruling against the three Appellants and, contending that Allstate brought its DTSA claims against them in bad faith, urge that they are entitled to attorneys' fees from Allstate under the statute. Starting with the court's resolution of the competing summary judgment motions, we consider each challenge in turn.

## II. Standard of Review

We apply a fresh-eyed de novo review to the district court's summary judgment rulings, scrutinizing the record as the district court did. Rivera-Corraliza v. Puig-Morales, 794 F.3d

208, 214 (1st Cir. 2015). Accordingly, we will affirm the court's dismissal of Appellants' counterclaims, and grant of summary judgment on Allstate's claims, should we agree that, after reviewing the record in the light most favorable to the non-movants, there were no genuine disputes of material fact and the court's conclusions were correct as a matter of law.[12] Lionbridge Techs., LLC v. Valley Forge Ins. Co., 53 F.4th 711, 718 (1st Cir. 2022).

### III.  Our Take

Our analysis begins by reviewing Appellants' counterclaims under Mass. Gen. Laws ch. 175, § 163, which entitles independent insurance agents to 180 days of notice before termination of their contracts, and Mass. Gen. Laws ch. 93A, § 2, which prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  After concluding that neither apply to Fougere and Brody-Isbill due to their exclusive relationships with Allstate, we move on to the company's trade secret misappropriation claims against Appellants.  Because we hold that the spreadsheets at issue

---

[12] Like the district court's analysis below, our review will largely apply Massachusetts law because Allstate's common law trade secret and breach of contract claims, as well as Appellants' counterclaims for inadequate notice, Mass. Gen. Laws ch. 175, § 163, and bad faith business practices, Mass. Gen. Laws ch. 93A, all arise from state law.  Both parties agree there is federal jurisdiction over these claims under 28 U.S.C. §§ 1332(a) (diversity jurisdiction) and 1367 (federal question jurisdiction).

contained trade secrets under the DTSA and Massachusetts common law, and that Appellants misappropriated them, we affirm the district court's summary judgment rulings in favor of Allstate across the board.

## A. Appellants' Counterclaims

We first turn to Appellants' counterclaims under Mass. Gen. Laws ch. 175, § 163 and Mass. Gen. Laws ch. 93A, both of which were dismissed by the district court after it granted Allstate's motion for summary judgment, and denied their motion for the same, on both counts.

## 1. Appellants' § 163 Counterclaim

Appellants urge us to reverse the district court's dismissal of their counterclaim under Mass. Gen. Laws ch. 175, § 163, which provides:

> No company shall cancel the authority of <u>any independent insurance agent for . . . casualty insurance . . . if said agent is not an employee of said company</u> . . . unless the company gives written notice of its intent to cancel such agent or its intent to modify such contract at least one hundred and eighty days before the proposed effective date of any such cancellation or modification.

(Emphasis added). Pressing the same argument here as they did below, Appellants contend that irrespective of how Fougere and Brody-Isbill were contractually categorized -- be they deemed exclusive or non-exclusive agents -- they fall under the plain sweep of this statutory provision because they were clearly not

- 14 -

employees of Allstate.  As they construe § 163, they qualify as independent insurance agents and were therefore entitled to at least 180-days' written notice from Allstate before they could be terminated.  And because they received no such notice, they argue, Allstate violated the statute.

After mulling over their argument, the district court rejected it and concluded, as Allstate had contended, that § 163 did not cover them.  Teed up for us then is the first question for our consideration:  Do Fougere and Brody-Isbill qualify as independent agents under § 163, making them entitled to its protections?  After a careful review of the statute, we think the court was right to conclude that they do not.

As we consider Appellants' state law claim, "we look to the pronouncements of [the] state's highest court" -- here, the Massachusetts Supreme Judicial Court ("SJC") -- "in order to discern the contours of that state's law."  In re Plaza Resort at Palmas, Inc., 741 F.3d 269, 274 (1st Cir. 2014) (quoting González-Figueroa v. J.C. Penney P.R., Inc., 568 F.3d 313, 318 (1st Cir. 2009)).  "Where, as here, on-point authority from the highest state court is unavailable, however, our task is to vaticinate how that court likely would decide the issue.  For this endeavor we employ the same method and approach that the state's highest court would use."  Id. (internal citations and quotations omitted).

Under Massachusetts law, "[a] fundamental tenet of

statutory interpretation is that statutory language should be given effect consistent with its plain meaning and in light of the aim of the Legislature unless to do so would achieve an illogical result." In re Custody of Victoria, 473 Mass. 64, 73 (2015) (quoting Sebago v. Bos. Cab Dispatch, Inc., 471 Mass. 321, 339 (2015)). In doing so, "each clause or phrase is to be construed with reference to every other clause or phrase without giving undue emphasis to any one group of words, so that, if reasonably possible, all parts shall be construed as consistent with each other so as to form a harmonious enactment effectual to accomplish its manifest purpose." Id. (quoting Worcester v. Coll. Hill Props., LLC, 465 Mass. 134, 139 (2013)). "In other words, [courts] consider the specific language of a statute in connection with the statute as a whole and in consideration of the surrounding text, structure, and purpose of the Massachusetts act." Id. at 73.

Mindful of these principles, we agree with the district court's conclusion that reading "independent agents" to encompass all non-employee agents, as Appellants urge, is a poor fit within the context of understanding § 163. Like the district court, we start with a basic principle: Mass. Gen. Laws ch. 175, § 163 "was intended to protect or benefit independent insurance agents and brokers in their dealings with insurance companies." Brooks v. Hanover Ins. Co., 23 Mass. App. Ct. 992, 993 (1987). As the district court saw it, § 163's use of the term "independent

insurance agents" necessarily refers to those free to sell insurance products for more than one company, or, in the parlance of the industry, agents operating under the American Agency System. See Arbella Mut. Ins. Co. v. Comm'r of Ins., 456 Mass. 66, 90 (2010) ("[I]n Massachusetts, an agent who does business pursuant to the American [A]gency [S]ystem is not an employee agent or an exclusive agent; such an agent is an independent producer and thus 'free to sell insurance products through more than one company.'" (quoting Nationwide Mut. Ins. Co. v. Comm'r of Ins., 397 Mass. 416, 418 (1986))).

We agree with this reasoning. The American Agency System is "a specialized canon of interpretative principles that applies to contracts between agents and insurers," see id. (emphasis omitted), which has been codified in Massachusetts under Mass. Gen. Laws ch. 175, § 162F. Under the terms of the statute, agents "doing business pursuant to the so-called American [A]gency [S]ystem, other than that of an employer to employee relationship, shall own and have an exclusive right to use certain insurance information contained in insurance policies . . . ." Mass. Gen. Laws ch. 175, § 162F.[13] As the SJC explained in Arbella Mutual Insurance Co., this information is typically referred to as

---

[13] Appellants brought a counterclaim against Allstate based on this statute, which the district court dismissed in its summary judgment order. On appeal, Appellants do not challenge the court's ruling on this claim.

"expirations" -- data, like insurance policy premiums and expiration dates, "necessary to solicit insurance policy renewals" when a policy is soon to expire. 456 Mass. at 88. The SJC noted that "[w]ithout an exclusive right to use that information, agents [within the American Agency System] effectively would cede their renewal business to insurers as soon as the agents submit applications." Id. In other words, insurance companies would be able to potentially sidestep the agents who originated the business and who would have otherwise worked with their clients on renewing their policies, either with the same company or another one, and instead, solicit policyholders directly for renewal. Id.

In our view, similar dynamics are at play with § 163. As the district court pointed out, § 163 concerns notice rights for certain agents should they be terminated by their agency. A key purpose of § 163, and its 180-day notice requirement, is to protect "independent" agents by making sure they have time to figure out how the upcoming termination will affect the policies they generated and placed with the insurer. See Frontier Mgmt. Co. v. Balboa Ins. Co., 622 F. Supp. 1016, 1019 (D. Mass. 1985); Brooks, 23 Mass. App. Ct. at 993. For example, and as the district court explained, to protect this interest, § 163 also includes an optional administrative procedure, Cigna Fire Underwriters Co. v. MacDonald & Johnson, Inc., 86 F.3d 1260, 1265 (1st Cir. 1996), which Appellants do not invoke on appeal, but by which an agent

- 18 -

may turn to referees to determine whether a termination will affect the policies placed by the agent, Frontier, 622 F. Supp. at 1019. Should the referees conclude that the agent's legitimate financial interests will be impacted, the statute requires the insurance company to renew the affected policy and provide an additional year of compensation to the terminated agent. Id.

In light of this statutory scheme, we conclude that the district court was correct to focus on what we believe is the operative question for determining § 163's applicability: Who owns the expirations? These expirations seem akin to gold in the industry -- they allow an agent to build diverse books of business and long-term relationships with policyholders that, come time for renewal, are unconstrained by the interests of any specific insurance carrier. In contrast, companies like Allstate, who choose to conduct business through the use of exclusive agents, already own this information, and affiliated agents are already obligated to seek renewals solely for the agency. As the district court aptly observed, "[t]he procedures established in § 163 for an agent to challenge a termination decision and seek post-termination renewals has no application to exclusive agents, where the renewals or continuations of the policies belong to the insurance company after termination, and not to the agent." In other words, "[u]nder an exclusive arrangement, there is no reason to have a hearing or otherwise establish a procedure for

determining the agency's continued entitlement to renewals," or for providing a 180-day period for assessing the financial implications of the termination. By virtue of owning the expirations, an agency like Allstate that does business through exclusive agents is clearly entitled to such renewals, rendering § 163's protections irrelevant.

But this interpretation, say Appellants, is flawed. In support, they point to Nationwide Mutual Insurance Co., wherein the SJC took a different tack when interpreting yet another insurance statute, Mass. Gen. Laws ch. 175, § 162D. 397 Mass. at 419. That statute, pursuant to a 1980 amendment, authorizes the state insurance commissioner to set rates for insurers "which do business in the commonwealth through independent licensed insurance agents pursuant to the so-called American Agency System or any other system, other than that of an employer to employee relationship." Mass. Gen. Laws ch. 175, § 162D. The court in Nationwide determined that the statute applied to an insurer with an "Exclusive Agency System" (similar to Allstate's), because that system did not "constitute[] an employer-employee relationship," the statute's only exception, and therefore "clearly f[ell] within the language" of the statute. Id. at 421.

In a footnote, the Nationwide court stated that "[a]gents who operate under either the 'Exclusive Agency System' or the 'American Agency System' are regarded as independent agents,

in contrast to agents who are employees of an insurance company." Id. at 418 n.2. Because Allstate similarly lacked employer-employee relationships with Fougere and Brody-Isbill, Appellants insist that they must be independent agents and therefore within the scope of § 163.

While we acknowledge the somewhat analogous phrasing of § 163 and § 162D, we resist the linguistic temptation to allow our analysis to turn entirely on a non-contextualized "explanatory" footnote of this other provision, and instead interpret § 163 alongside its distinctive text, context, and purpose. After all, "[t]he object of all statutory construction is to ascertain the true intent of the Legislature from the words used," so that "the purpose of [the statute's] framers may be effectuated." Johnson v. Kindred Healthcare, Inc., 466 Mass. 779, 783 (2014) (internal citations omitted).

At no point did the Nationwide court purport to interpret § 163, which is at issue in this case, and the footnote that Appellants rely on is irrelevant to the court's reasoning and to the text of the statute. The Nationwide court was confronted with resolving a different question and interpreting a different statute than the one at issue here, so its dictum in a footnote may not short-circuit our best reading of § 163. Therefore, we decline to adopt Appellants' interpretation of § 163 because, under Massachusetts principles of statutory interpretation, Allstate's

reading of the statute prevails.

But our analysis does not end there. Even if "independent agents," for the purposes of § 163, are those who own the expirations of the policyholders they are associated with, Fougere and Brody-Isbill say they nonetheless fall within the statute's purview because the record demonstrates they were not exclusive agents. They take issue with the district court's conclusion to the contrary and maintain that the very language of their EA agreements places this characterization issue in dispute, thus making the grant of summary judgment inappropriate.[14] The provision Appellants point to for support, Section XXI(G) of the EA agreements, states that "[t]he authority granted to Agency under this Agreement is nonexclusive." Thus, they say, the contract directly contradicts the court's finding. We disagree.

Continuing, the provision cited by Appellants states that "[t]he term 'Exclusive' as used in the title of this Agreement refers to the obligations assumed by Agency under Section I.E."

---

[14] They also claim that the record contains a factual dispute as to whether the former agents were exclusive. In an affidavit, Fougere represented that when he became an agent for Allstate, the company "strongly encouraged [him] to continue servicing and selling to all of [his] customers until [he] could . . . convert those customers to Allstate policies." We find this argument unavailing. As the district court pointed out, Fougere's allegation does not challenge the exclusive nature of the relationship; "[a]t most, it states that, with Allstate's permission, Fougere was free to place non-competitive insurance with other insurers."

- 22 -

Turning to Section I.E., the provision states that the agencies "will not, either directly or indirectly, solicit, sell, or service insurance of any kind for any other company, agent, or broker . . . without the prior written approval of [Allstate]." As we read these provisions in the aggregate, they clearly establish the relationships between Allstate and its agents as exclusive, by requiring the agents to solely sell insurance products on behalf of Allstate and no other company.

Given the exclusive nature of Fougere's and Brody-Isbill's relationships with Allstate, and, accordingly, the fact that neither owned the expirations from their former Allstate agencies, they do not qualify as "independent agents" under the terms of § 163. Therefore, we affirm the district court's summary judgment ruling dismissing the counterclaim.

### 2. Appellants' Chapter 93A Counterclaim

Shifting gears, Appellants also raise a challenge to the district court's grant of summary judgment to Allstate on their counterclaim which charged that Allstate engaged in bad faith business practices in violation of Mass. Gen. Laws ch. 93A. Their claim is premised on the notion that, contrary to the district court's determination that Fougere's and Brody-Isbill's relationships with Allstate were analogous to an employer/employee situation and thus not covered by 93A, they in fact had an independent contractor relationship with Allstate akin to a

franchisor/franchisee arrangement which the statute, they argue, does reach.

As pertinent here, Chapter 93A prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, §§ 2, 11. Designed "to encourage more equitable behavior in the marketplace[,]" Manning v. Zuckerman, 388 Mass. 8, 12 (1983), the statute applies to transactions that are commercial in nature between parties engaged in "trade or commerce," see States Res. Corp. v. The Architectural Team, Inc., 433 F.3d 73, 84 (1st Cir. 2005); Linkage Corp. v. Trs. of Bos. Univ., 425 Mass. 1, 23 (1997). This requirement excludes certain transactions, such as strictly private transactions like those between business partners or an employer and employee. Debnam v. FedEx Home Delivery, 766 F.3d 93, 96-97 (1st Cir. 2014). For non-employee relationships, like those between Allstate and its former agents, this court has concluded that Chapter 93A applicability hinges on "a fact-specific, case-by-case analysis into the type of relationship that the independent contractor has with the company at issue." Id. at 97 (internal quotation marks and citation omitted). In Debnam, we held that the operative question in such cases was whether the independent contractor "was offering [their] . . . services generally . . . for sale to the public in a business transaction." Id. Relying on this language, the district court here concluded

- 24 -

that Fougere's and Brody-Isbill's relationships with Allstate did not qualify. It reasoned as much based on its conclusion that the relationships were exclusive because the two agents were not permitted to sell other insurers' products in competition with Allstate.

In their brief, Appellants claim legal error in the court's reasoning. Appellants suggest that the court failed to appreciate Fougere's and Brody-Isbill's relative independence from Allstate, noting that they "formed their own agencies, conducted their own advertising and marketing, [and] solicited their own customers." As noted earlier, in Appellants' view, Fougere's and Brody-Isbill's Allstate agencies might better be understood as franchises, which they contend are subject to Chapter 93A prescription. For support, they cite to several cases involving franchises where, according to them, Chapter 93A was found to apply, see Brennan v. Carvel Corp., 929 F.2d 801, 802, 811-12 (1st Cir. 1991); Krumholz v. AJA, LLC, 691 F. Supp. 2d 252, 254, 257 (D. Mass. 2010); Zapatha v. Dairy Mart, Inc., 381 Mass. 284, 285-87, 297-300 (1980), but they offer no explanation whatsoever of how these cases are at all applicable to the dispute here. Below, the district court rejected this theory after pointing out that nothing in the EA agreements, or otherwise, favored understanding the agency relationships to be between a franchisor and its franchisees.

After considering Appellants' argument, we echo the district court in rejecting it. As the court pointed out, each "EA Agreement does not mention 'franchise,' 'franchisee,' or 'franchisor' anywhere, and there is no evidence to support the conclusion that the defendants were to be considered franchisees." In the face of these unambiguous contracts, Appellants may not recast Fougere and Brody-Isbill's relationships with Allstate under this term.

Similarly, the EA agreements foreclose Appellants' case for inclusion under Chapter 93A because we agree with the district court that their exclusivity with Allstate defeats this pursuit. Because Fougere and Brody-Isbill worked as exclusive agents, they were not offering their business services to the public, but only to Allstate. Given that their work was solely on behalf of Allstate, for which they had contracted to seek out customers, they were not selling their professional services to the public. Therefore, they were not engaged in "trade or commerce" and Chapter 93A has no application here. See Debnam, 766 F.3d at 98 (no 93A application when plaintiff's business was devoted entirely to serving one company); Benoit v. Landry, Lyons, & Whyte Co., 31 Mass. App. Ct. 948, 948 (1991) (no 93A application when salesperson provided services for only one broker).

In their reply brief, Appellants attempt to distinguish their case from Debnam and Benoit. However, we disagree with their

untimely protestations, and agree with the district court and Allstate that the cases apply here. See Debnam, 766 F.3d at 97-98 (favorably citing Benoit and other cases finding 93A did not apply because the parties' relationship was exclusive); Benoit, 31 Mass. App. Ct. at 948 (finding 93A did not apply because the plaintiff was prohibited "from receiving payment for his services from anyone except the single broker with whom he or she is affiliated").

We therefore agree with the district court's conclusion that Chapter 93A does not apply to Allstate's relationships with Fougere and Brody-Isbill, and that the company was entitled to summary judgment on this claim.

## B. Allstate's Claims

We now turn to the claims brought against Appellants by Allstate, for trade secret misappropriation in violation of the DTSA and Massachusetts common law and in breach of Fougere's and Brody-Isbill's EA agreements.[15]

The DTSA and Massachusetts common law both provide protections for individuals and entities claiming misappropriation

---

[15] Given that the EA agreements prohibited Fougere and Brody-Isbill from misusing the confidential information contained in the spreadsheets, and Appellants raise no specific challenges to the district court's breach of contract findings outside of their broader trade secret arguments, we consider the breach of contract rulings concurrently. That is, should we affirm the district court's findings of trade secret misappropriation, we would affirm the court's breach of contract rulings accordingly.

- 27 -

of their trade secrets. To prevail on such a claim under Massachusetts common law, a plaintiff must show that the information is a trade secret which "the defendant used improper means, in breach of a confidential relationship, to acquire and use." Incase Inc. v. Timex Corp., 488 F.3d 46, 52 (1st Cir. 2007). Here, the district court, quoting Viken Detection Corp. v. Videray Techs. Inc., 384 F. Supp. 3d 168, 177 (D. Mass. 2019), assumed that "[t]he standard for misappropriation under the DTSA is substantially similar to that under Massachusetts law." Because neither party challenges this framing, we assume the same as we dive into Appellants' arguments on appeal.[16] In other words, our analysis will draw no distinction between the district court's misappropriation findings under the DTSA and state common law, affirming or reversing them in tandem.

In their brief, Appellants raise multiple challenges to the district court's trade secret rulings. They maintain that:

- the information contained in the spreadsheets do not constitute trade secrets;

---

[16] We pause to note that the Massachusetts cause of action for trade secret misappropriation also requires the plaintiff to demonstrate that they "took reasonable steps to preserve the secrecy of the [trade secret] information." Incase, 488 F.3d at 52. Because the DTSA defines trade secrets in part as information which "the owner . . . has taken reasonable measures to keep . . . secret," 18 U.S.C. § 1839(3)(A), we fold this consideration into our analysis of whether or not the spreadsheet information constituted trade secrets.

- 28 -

- (as we understand their argument) even if they did, Allstate was not the owner of the documents and the information contained within, defeating the company's misappropriation claims; and

- summary judgment was inappropriate in any event, because Allstate failed to present evidence that Appellants used improper means to acquire the information contained within the spreadsheets.

We consider these arguments in turn.

1. **The Contents of the Spreadsheets as Trade Secrets**

The DTSA and Massachusetts common law overlap in their definitions of trade secrets. The DTSA defines trade secrets, in relevant part, as:

> [A]ll forms and types of financial [and] business . . . information, including . . . compilations, . . . whether tangible or intangible, and whether . . . stored [or] compiled . . . electronically . . . if -- (A) the owner . . . has taken reasonable measures to keep [the] information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]

18 U.S.C. § 1839(3). In a similar vein, Massachusetts law takes the term to include "compilation[s] of information which [are] used in one's business, and which give[] him an opportunity to obtain an advantage over competitors who do not know or use it."

Burten v. Milton Bradley Co., 763 F.2d 461, 463 n.2 (1st Cir. 1985) (quoting J. T. Healy & Son, Inc. v. James A. Murphy & Son, Inc., 357 Mass. 728, 736 (1970)).

The SJC has long used factors mirrored in the DTSA's trade secret definition for its own common law trade secret analysis. According to the court:

> Although no general and invariable rule can be laid down, . . . [there are] six factors of relevant inquiry: (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and to his competitors; (5) the amount of effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

Jet Spray Cooler, Inc. v. Crampton, 361 Mass. 835, 840 (1972) (internal citations and quotation marks omitted). We invoke these factors, as relevant, throughout our analysis.

Appellants raise challenges to the district court's trade secret findings under either definition (making no distinction between them in their arguments). Specifically, Appellants assert that the record is rife with genuinely disputed facts indicating that the spreadsheet information was publicly available and had no independent economic value, and that Allstate did not take reasonable steps to protect it. As they see it, the

court committed legal error by finding to the contrary. Because these challenges are relevant to both federal and state trade secret definitions, we follow Appellants' lead and consider their challenges to the trade secret findings under both the DTSA and Massachusetts common law concurrently.

### a. Public Knowledge

It is axiomatic that "[m]atters of public knowledge or of general knowledge in an industry cannot be appropriated" by an entity as a trade secret. Burten, 763 F.2d at 463 n. 2 (quoting J. T. Healy & Son, Inc., 357 Mass. at 736). Citing this principle, Appellants suggest that the district court committed legal error when it concluded that the spreadsheets' contents constituted trade secrets because, according to them, "[e]ach of the individual items of information contained in the [s]preadsheets were . . . of public record." This broad (and unsupported) statement highlights the dispute between the parties on the extent to which the spreadsheets contain, and might be duplicated using, publicly available information. Appellants maintain that Fougere compiled the spreadsheets using information he had acquired from third party sources such as the Massachusetts Registry of Motor Vehicles ("RMV") and Lexis/Nexis, whereas Allstate counters that certain portions of the sheets were not available through any of those means.

Here, we disagree with Appellants. The publicly accessible nature of certain portions of the spreadsheets certainly informs our trade secret analysis. See 18 U.S.C. § 1839(3)(B) (defining trade secrets, in part, as having value "from not being generally known to, and not being readily ascertainable through proper means by" others); Jet Spray Cooler, 361 Mass. at 840 (listing "the extent to which the information is known outside of the business" and "the ease or difficulty with which the information could be properly acquired or duplicated by others" as factors to be considered in a trade secret analysis). However, it is not dispositive, and does not defeat Allstate's trade secret claims. Rather, we affirm their grant after concluding that the inclusion of some information in compilations which could have been obtained from public sources does not mean the compilations were not trade secrets, and that trade secrets may be found, even as to that information, when it would have been immensely difficult to collect and compile it in the form in which it appeared in the compilation.

To remind, here Allstate claimed the information within the spreadsheets to be trade secrets. Even assuming Fougere retrieved some of this information from his claimed sources, it would be difficult, if not impossible, to develop the spreadsheets -- which listed thousands of Allstate customers, along with their personal and policy information -- solely through those means. As

the district court pointed out, "there is no question that the compilation of customers, addresses, premium rates, renewal dates and the like are not readily available to the public."

The parties' factual disputes on this issue do not challenge this conclusion. For example, according to a deposition of one Allstate witness (but disputed by Appellants), premium amounts, which were included in the spreadsheets, are not publicly available. And although Allstate witnesses testified that one could access a person's coverage status, driver's license information, and vehicle information through the RMV, they maintained that this information can only be accessed by insurance agents for the purposes of risk assessment, and not for any marketing purposes (as Fougere claims to have done when creating the spreadsheets). Further, Allstate points to information within the documents that it maintains is not publicly accessible. According to the company, "the RMV, for example, does not store email addresses, while the [s]preadsheets found on ABIA's systems are replete with the email addresses of Allstate policyholders." The company also states that "none of the 'public' information Appellants point to identifies whether any individual is an Allstate customer" -- a claim which Appellants contest.

Regardless of these disagreements, we see no error in the district court's summary judgment logic and agree with its conclusion that the compilations would not have been known outside

of Allstate, and, to the extent they were duplicable, could only be recreated at immense difficulty. See, e.g., Optos, Inc. v. Topcon Med. Sys., Inc., 777 F. Supp. 2d 217, 239 (D. Mass. 2011) (finding the factors favored treating a customer list containing public information that would have been "practically impossible" for someone to duplicate as a trade secret).

This context clearly distinguishes the spreadsheets and their contents from the common industry symbol that a plaintiff sought to claim as a trade secret in Blake v. Professional Coin Grading Service, 898 F. Supp. 2d 365 (D. Mass. 2012). In Blake, which Appellants cite in support of their case, the court rejected the plaintiff's claim based on the conclusion that the purported trade secret was already "in the public domain . . . there for the free use of the public." Id. at 379 (internal quotation marks and citation omitted). In contrast (and to repeat), the spreadsheets here contained unique information -- customers' policy numbers, home ownership status, driver's license information, customer status with Allstate, and most significantly for competitively selling insurance products, premium amounts.[17] At the very least, Blake is inapplicable given that extensive compilations of this

_____

[17] This also distinguishes the spreadsheets from "naked customer lists" which, according to Appellants, may not be considered trade secrets. See Lunt v. Campbell, No. 07-3845-BLS2, 2007 WL 2935864, at *3 (Mass. Super. Ct. Sept. 24, 2007) (concluding that it "is not apparent that mere names and telephone numbers of customers . . . constitute confidential information").

- 34 -

information are clearly not already in the public domain free for use. And more broadly, the vast and at least partially confidential nature of the information here favors a trade secret finding.

Therefore, we find no error on this ground.

### b. Independent Economic Value

Next, we consider the economic value of the spreadsheets' contents to Allstate and its competitors, a key factor for determining whether or not the spreadsheet information may be defined as trade secrets. See 18 U.S.C. § 1839(3)(B) (defining trade secrets in part as information which "derives independent economic value"); Jet Spray Cooler, 361 Mass. at 840 (including "the value of the information to the employer and to his competitors" as a factor relevant for making a trade secret determination).

Appellants argue that Allstate failed to demonstrate that the information had independent economic value, given their factual declarations, under oath, that the spreadsheets were not commonly used by ABIA and that ABIA employees failed to successfully make a sale using them. In reply, Allstate points us to the value of the customer information to the company, which was enumerated in the EA agreements, as well as the value of such information to any insurer looking to compete with the company.

In our view, the undisputed facts support the district court's finding that the spreadsheets' contents had economic value. As the district court pointed out, and Allstate reiterates, the EA agreements expressly stated that misuse of the company's confidential information would cause "irreparable damage" which, by definition, cannot be adequately compensated or remedied by any monetary award or damages that may subsequently be awarded. See Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 19 (1st Cir. 1996) ("If the plaintiff suffers a substantial injury that is not accurately measurable or adequately compensable by money damages, irreparable harm is a natural sequel."); see also Tri-Nel Mgmt., Inc. v. Bd. of Health of Barnstable, 433 Mass. 217, 227-28 (2001) (noting that "[e]conomic harm alone . . . will not suffice as irreparable harm"). Clearly, Allstate believed that misuse of the information would not only exceed, but also entail, economic harm. Demonstrating this point, the EA agreements went as far as expressly providing a way for terminated agents to sell their "economic interest" in their Allstate books of business to an Allstate-approved buyer, expressly signaling the value to the company of maintaining the information.[18]   This is hardly

---

[18] We disagree with Appellants' alternative spin on this fact, by which they argue that the district court erred by finding Allstate had economic value in Fougere's and Brody-Isbill's "books of business" (their Allstate expirations, like the spreadsheet information) given that under the EA agreements the two owned the economic interests in these books. As we understand it, they

surprising -- as we discussed above, "expirations," like the data included in the spreadsheets, are so valuable in the industry that there is an entire system of rules to protect agents with exclusive rights to them. See Arbella Mut. Ins. Co., 456 Mass. at 89 (describing the "American Agency System" as "giv[ing] agents privileged rights to insurance expirations over the insurers with whom they contract"); see generally 4 Couch on Insurance § 57:58 (3d ed. 2023) (describing the American Agency System's protection of agents' rights to expirations). In the hands of a competitor like ABIA, the spreadsheet information could be used to compete with Allstate by offering, for example, insurance at premiums the competitor knows to be less than what the customer currently pays.

believe the court committed legal error in finding economic value "[b]y equating the value of the books of business to the value of the [s]preadsheets and their contents" -- the former of which they claim (without citation) is based on commissions Allstate was paying to each agent, presumably as distinct from any value inherent in the customer information.

Setting aside the fact that this mischaracterizes the district court's reasoning -- which based its conclusion on multiple additional indications that the spreadsheet information had economic value -- the court's point stands. In the course of finding economic value in the contents of the spreadsheets, the court noted that "when Exclusive Agents elect not to sell the economic value in their book of business, Allstate can cede those customer accounts to other Exclusive Agents" to incentivize strong sales, entice new agents, and serve the customers listed. We agree with the district court that in such instances -- like here, where, to our knowledge, neither former agent sold their book of business -- this further demonstrates the independent economic value of the information to Allstate.

That ABIA employees allegedly failed to make any sales using this information does not diminish its potential value.

Before moving on, we consider and reject an additional argument raised by Appellants, who contend that a finding of economic value here conflicts with Allstate's decision to dismiss its claims for actual damages (which are based on economic harms suffered by a prevailing party), because the choice amounted to a waiver of the right to claim the company suffered economic harm from Appellants' misappropriation of the information.[19] We are unaware of any case law which suggests that Allstate's decision to forego tangible damages from Appellants for their misappropriation requires concluding that the information misappropriated had no economic value.

Therefore, we affirm the district court's finding that the information contained in the spreadsheets had independent economic value.

### c. Steps Toward Protecting the Information

Moving to Appellants' final challenge to defining the spreadsheets' contents as trade secrets, we consider their claim

---

[19] In passing, Appellants also suggest that the company waived its right to claim economic value because, in their view, "Allstate did not treat the [s]preadsheets as a trade secret or having value" when it came to investigating the spreadsheets and following up with the former ABIA employees to ensure they were not still using the spreadsheet information to compete with Allstate. We disagree. The undisputed facts demonstrate the information had economic value to the company.

that the district court erred in finding that Allstate took sufficient steps to protect the information. Appellants suggest that there are material factual disputes on this question and point to a range of actions that the company, in their view, should have taken to protect the information.[20]

In determining whether information constitutes a trade secret, both the DTSA and Massachusetts common law consider the steps taken to protect the information. See 18 U.S.C. § 1839(3) (defining trade secrets as those which "the owner . . . has taken reasonable measure[s] to keep . . . secret"); Jet Spray Cooler, 361 Mass. at 840 (listing "the extent of measures taken by the employer to guard the secrecy of the information" as a factor relevant for determining a trade secret). To determine whether a company took reasonable steps to protect its trade secrets, courts have considered "1) the existence or absence of a [confidentiality agreement], 2) the nature and extent of precautions taken, 3) the circumstances under which the information was disclosed and 4) the degree to which the information has been placed in the public

---

[20] These include providing training on securing the confidentiality of customer information (which Allstate claims, but Appellants dispute, was provided to Fougere and Brody-Isbill), limiting the transmission of customer information to outside entities like car dealerships, taking steps to secure and control the management of information at Fougere's and Brody-Isbill's Allstate agencies, and, after terminating their EA agreements, ensuring there was no customer information on their computers.

domain or rendered readily ascertainable." TouchPoint Sols., Inc. v. Eastman Kodak Co., 345 F. Supp. 2d 23, 29 (D. Mass. 2004).

No one disputes the presence of confidentiality provisions in the EA agreements. Moving on then to the other considerations, we agree with the district court's conclusion that the undisputed facts in the record indicate that Allstate took multiple steps towards protecting the information contained within the spreadsheets and preventing it from disclosure. Through the EA agreements, Allstate specified and communicated clearly which information was confidential and how it was to be handled. Allstate also took multiple precautions to protect the information by only granting access to agents, restricting its availability through the use of passwords and, upon termination, revoking access by former agents. And as we discussed above, regarding the final consideration, the information was not in the public domain nor readily ascertainable.

Altogether, this record evidences sufficient steps taken by Allstate to protect its trade secret information. See Jet Spray Cooler, 361 Mass. at 841-42 (finding trade-secret plaintiff needed to take "an active course of conduct" to protect it); cf. Incase, 488 F.3d at 53 (finding plaintiff did not take reasonable steps because they failed to communicate confidentiality policies to defendant). Because "the standard is reasonableness, not perfection," see Touchpoint Sols., 345 F. Supp. 2d at 30,

- 40 -

Appellants' contentions that Allstate could have done more to protect the information do not undermine this conclusion, see Optos, 777 F. Supp. 2d at 240 ("[A] company need not take 'heroic measures' to preserve the confidentiality of its trade secrets." (quoting USM Corp. v. Marson Fastener Corp., 379 Mass. 90, 101 (1979))).

Therefore, we affirm the district court's finding that Allstate took sufficient steps to protect the information contained in the spreadsheets.

All in all then, after evaluating the spreadsheets, we find the information contained therein was not readily accessible to the public, had economic value, and was reasonably protected from public disclosure. Accordingly, we affirm the court's conclusion that the information constituted trade secrets.

### 2. Ownership of Spreadsheets

Satisfied that the spreadsheet information may be defined as trade secrets, we next consider the question Appellants squarely raise and contest in their brief: Who owns it? As Appellants see it, the customers, whose information the sheets contained, and Fougere, who compiled the spreadsheets himself, own the information -- purportedly dooming Allstate's trade secrets misappropriation claims. See 18 U.S.C. § 1836(b)(1) (providing that "[a]n owner of a trade secret that is misappropriated may bring a civil action" (emphasis added)); Burten, 763 F.2d at 462

- 41 -

(noting that Massachusetts common law provides "protection to the owner of a trade secret for the misappropriation of his ideas" (emphasis added)).  Appellants raise a threshold challenge here, arguing that the record contains multiple facts indicating that Allstate did not own the spreadsheet information (and therefore may not claim it as misappropriated trade secrets).

The district court rejected this argument below, after concluding that "[t]here is no question that the information contained in the [spreadsheets] are the types of information that are specifically listed as being 'confidential' in the EA Agreements."  For support, the court (again) called out the former agents' EA agreements, which expressly provided that any confidential information acquired by the agents while working with the company -- such as the customer and policy information contained in the spreadsheets -- is "wholly owned by [Allstate]."

Appellants cite several alleged facts within the record which, in their view, indicate that this conclusion is in dispute. Specifically, they contrast their detailed description of how Fougere allegedly compiled the spreadsheets -- i.e., by turning to publicly available sources (as discussed above) and his relationships with other entities -- with Allstate witness deposition testimony suggesting that the company was unfamiliar with the spreadsheets and how they were created.

In our view, the language of the EA agreements renders

these alleged facts immaterial, and any role that the agents played in compiling the spreadsheets irrelevant for the purposes of determining ownership.[21]  See Martinez v. Colon, 54 F.3d 980, 984 (1st Cir. 1995) ("It is only when a disputed fact has the potential to change the outcome of the suit under the governing law if found favorably to the nonmovant that the materiality hurdle is cleared.").  As the district court pointed out, there is nothing in the agreements "which indicates in any way that confidential information is limited to information compiled by Allstate instead of the Agency."  Quite the opposite, the agreements expressly described confidential information, and stipulated that "[a]ny confidential information or trade secrets recorded on . . . [an] electronic data file . . . whether provided by [Allstate] or by [Fougere's or Brody-Isbill's] Agency, is the exclusive property of [Allstate], as is any such medium and any copy of such medium."

---

[21] For this reason, two of Appellants' related arguments gain no traction.  First, they contend the district court inappropriately questioned the credibility of Fougere's claims that he purchased the information included in the spreadsheets. To the contrary, the district court, for the purposes of summary judgment, assumed "that the spreadsheets contain at least some information that [Fougere] purchased."  The district court did so because this disputed fact was not necessary for resolution on summary judgment, because the EA agreements made ownership clear.

Appellants also challenge Allstate's ownership on the grounds that some of the information protected as confidential by the EA agreements is also owned by the Allstate customers themselves, or may be available from or transmitted by Allstate to third-party sources.  As we see it, this does not displace the terms of the EA agreements, and the ownership of the information conferred to Allstate by them.

(Emphasis added).

Because the agreements established Allstate as the owner of the customer information included within the spreadsheets, we affirm the district court's finding to this effect.[22]

### 3. Improper Means

Having affirmed the district court's conclusion that the spreadsheet information constituted trade secrets, and that Allstate owned those secrets, we finally consider the evidence within the record of misappropriation by Appellants. They argue that the district court erred in granting summary judgment because the record contained factual disputes about whether Fougere and Brody-Isbill misappropriated confidential information contained

---

[22] Appellants appear to misunderstand the significance of this fact. They maintain that the court erred by finding a breach of the EA agreements before first determining whether the spreadsheet information constituted trade secrets separately under the law. As they see it, this amounted to the enforcement of an illegal contract because, according to them (citing no law in support), it is illegal for a contract to "create" trade secrets enforceable by law.

We find this argument to be a nonstarter. Appellants do not point to any authority which suggests the court was obligated to conduct its analysis in a different order, and their arguments seem to be at odds with Massachusetts law on what information may be protected by a contract and/or described as a trade secret. See Foster-Miller, Inc. v. Babcock & Wilcox Can., 210 F.3d 1, 8 (1st Cir. 2000) (noting "doubt about whether and how the Massachusetts courts differentiate among confidential information, proprietary information, and trade secrets"); id. ("We further have recognized that confidential and proprietary business information may be entitled to protection, even if such information cannot claim trade secret protection." (quoting Warner-Lambert Co. v. Execuquest Corp., 427 Mass. 46, 49 (1998))).

- 44 -

within the spreadsheets.[23]  Specifically, they contend that Allstate presented no evidence that either former agent -- and particularly not Brody-Isbill -- misappropriated anything in violation of their EA agreement.  From Allstate's perspective, the undisputed facts demonstrate liability for both agents.

To quickly dispose of their broader challenge, we disagree with Appellants' claim that the record lacked evidence of their misappropriation.  Most damning is the undisputed fact that the spreadsheets found on ABIA's computer contained information, as we've already described, which the EA agreements unquestionably designated as confidential, and which constitute trade secrets owned by Allstate.

Appellants' challenge as to Brody-Isbill's liability is more focused.  Their brief first argues Allstate presented zero evidence implicating her for misusing information owned by Allstate other than the allegation, made by the former ABIA employees who blew the whistle on them to Allstate, that Brody-

---

[23] We pause to note that, while Appellants also appeal the district court's DTSA ruling against ABIA, they raise no arguments about ABIA's specific misappropriation (or lack thereof).  In the absence of such arguments, and having addressed the other elements of the DTSA claim above (finding the spreadsheet information to be trade secrets owned by Allstate) we need not opine on the evidence in the record regarding misappropriation by ABIA in order to affirm the court's ruling against the party.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("Judges are not expected to be mindreaders.  Consequently, a litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace." (internal quotation marks and citation omitted)).

Isbill was present when Fougere informed them that the spreadsheets were retained from both of the former agents' Allstate agencies. This, they say, is insufficient. Appellants next argue that finding Brody-Isbill liable was inappropriate because, as they tell it, the district court found that the extent of her involvement with the spreadsheets was in dispute and thus, it was not fit for a summary judgment ruling.

After zooming in on the record, we agree with Allstate -- both of Appellants' assertions lack merit. As Allstate highlights, two evidentiary offerings in particular, which were not genuinely contested before the district court, implicate both Appellants: (1) the high match rate of customers listed in both Allstate's audit of Brody-Isbill's book of business and the screenshot procured of TU Auburn and (2) the affidavits of the former ABIA employees. In response to Allstate's factual assertions, when opposing the company's motion for summary judgment, Appellants maintained that Brody-Isbill played no role in creating or using the spreadsheets, and specifically challenged the process by which the comparisons between TU Auburn and her Allstate book of business were drawn. However, they ultimately conceded that the spreadsheets included Allstate information from her former agency which, as we've already concluded, belonged to Allstate. Further, while broadly attacking the affidavits of the former ABIA employees as questionable and noncredible, they

nonetheless do not directly deny the truthfulness of the allegation that Brody-Isbill was present (and, presumably, silent) when Fougere represented that the lists were retained from both former Allstate agencies.[24] Nor do they explain why, therefore, the district court was wrong to rely upon them. Consequently, we find Appellants' arguments lacking.

Addressing the other claim raised by Appellants -- that the district court never actually found Brody-Isbill indisputably liable for breach of contract, but instead had deferred a determination of the scope of misappropriation, if any, for trial -- Allstate says this is not so. We agree and understand the essence of the court's reasoning to go like this: Given that Appellants presented nothing rebutting Allstate's evidence of misappropriation by Brody-Isbill aside from Appellants' blanket and unspecific denials of culpability, the district court

---

[24] Along these lines, Appellants argue that "[i]n discussing the ex-employees, the district court ignored their contradictory and qualifying deposition testimony and only relied on the affidavits[.]" Similarly, they claim error in the fact that the district court "also made the non-probative point that Ms. Brody-Isbill used a false name when talking to customers while at ABIA." They contend that subsequent deposition testimony called this point into question.

Appellants do not point to, and we do not discern, any material facts that either argument places in dispute. Ultimately, Brody-Isbill's liability stems from the undisputed fact that one of the spreadsheets contained confidential information from her former Allstate agency, and the unchallenged testimony that she was present when Fougere discussed the document at ABIA. Because Appellants' arguments do not challenge these points, we consider them no further.

considered the undisputed evidence against her (i.e., the TU Auburn spreadsheet previously described, and the testimony of former ABIA employees), and determined that any remaining discrepancies, that is, those getting only at "the scope of Brody-Isbill's involvement in any misappropriation," (our emphasis, but the court's words) ought to be resolved at trial for damages. Our understanding of the court's misappropriation reasoning and determination is further undergirded by the district court's grant of summary judgment, on liability, to Allstate and against Brody-Isbill on this very claim. And Allstate's later decision to settle for nominal damages instead of proceeding to trial on actual damages does nothing to displace this finding. In other words, by so settling, the company took the scope, but not the question, of Brody-Isbill's liability off the table.

### 4. Summing up on Trade Secret Misappropriation

Given our fresh assessment of Appellants' challenges, we affirm the district court's grant of summary judgment to Allstate on liability for its trade secret and contract claims against Appellants.[25]

### C. The Court's Denial of Reconsideration

Finally, we briefly address Appellants' contention that

---

[25] We briefly acknowledge, and summarily reject, Appellants' abbreviated argument that neither Fougere nor Brody-Isbill should be subject to a permanent injunction "because there was no misappropriation of trade secrets and no breach of their Agency

the district court, in denying their motion for reconsideration, "declined to apply the principles of law articulated in" TLS Mgmt. & Mktg. Servs., LLC, 966 F.3d 46 at 49 (TLS).[26] There this court concluded that the company claiming a trade secret violation had failed to sufficiently "separate the [purported] trade secrets from the other information . . . [that was] known to the trade." Id. at 54 (alterations in original) (internal quotation marks and

---

Contracts." Having affirmed the district court's summary judgment rulings to the contrary, this argument lacks basis.

Similarly, we have not overlooked Appellants' district court argument, cursorily raised in their reply but not opening brief, that the permanent injunction was inappropriate because "there is no evidence of the existence of irreparable harm to grant a permanent injunction[.]" But because Appellants raised this argument belatedly, and did not develop it any further, we move on from it. See Zannino, 895 F.2d at 17.

Given our conclusion that the injunction legitimately stands, we also dispose of Appellants' claim that it may not be imposed against ABIA because the company was not a party to the EA agreements. As the district court recognized, under Federal Rule of Civil Procedure 65(d)(2)(C), entities "who are in active concert or participation" with parties to an injunction may similarly be enjoined. As an active participant in Fougere's and Brody-Isbill's violations, ABIA is properly subject to the injunction.

Finally, we reject Appellants' argument that they are entitled to attorneys' fees because Allstate brought its DTSA claim in bad faith. The DTSA provides, in relevant part, that "if a claim of the [trade secret] misappropriation is made in bad faith" a court may "award reasonable attorney's fees to the prevailing party." 18 U.S.C. § 1836(b)(3)(D) (emphasis added). Because Allstate prevailed on its misappropriation claims, Appellants are not eligible for fees.

[26] The parties, disagreeing about the extent to which this was legal error, incorporate their TLS arguments into their trade secret analyses. However, because Appellants' arguments citing the case arose for the first time on reconsideration, we consider them separately, under the appropriate standard of review.

citation omitted).  As Appellants see it, Allstate similarly failed to identify its trade secrets with adequate specificity.  Instead, the argument goes, Allstate inappropriately identified a grouping of information and left it to the court "to ferret out what may or may not be a trade secret," and the court committed legal error under TLS by following this line and concluding that the whole of the spreadsheets amounted to trade secrets.

"[M]otions for reconsideration are appropriate only in a limited number of circumstances:  if the moving party presents newly discovered evidence, if there has been an intervening change in the law, or if the movant can demonstrate that the original decision was based on a manifest error of law or was clearly unjust."  United States v. Allen, 573 F.3d 42, 53 (1st Cir. 2009). We review denials for abuse of discretion.  Id.

We discern no abuse of discretion here.  As the district court suggested, Appellants' arguments elide the significant differences between TLS and this case.  In TLS, the company claiming trade secret violations argued that certain compilations of both public information and individual client information constituted trade secrets, but could not articulate what, specifically, within the compilations qualified as trade secret materials.  966 F.3d at 53.  In contrast, here Allstate has consistently maintained that the spreadsheets contained compilations of customer and policy information which were

expressly labeled as confidential trade secret information within its EA agreements with Fougere and Brody-Isbill. In its summary judgment motion, Allstate stated that it was claiming, as trade secrets, the Allstate customer information contained within the spreadsheet -- including thousands of Allstate customers' names, addresses, policy numbers, types of insurance coverage, premiums, and renewal dates. This does not require the courts to "ferret" anything out as Appellants claim, given that Allstate alleged and the district court held that such "confidential customer information included in the spreadsheets qualify as trade secrets."

Further, as the district court noted below when it denied Appellants' motion to reconsider, the purported trade secrets at issue in TLS were not customer lists. Because such lists would inevitably include some degree of customer-specific information within the public domain, this context is relevant. Here, given that the sheets amounted to customer lists containing information specifically identified as confidential in the EA agreements, we agree with the district court's conclusion that Allstate alleged sufficiently specific trade secrets. See J. T. Healy & Son, Inc., 357 Mass. at 736 (explaining that "[a] trade secret may consist of . . . a list of customers" where the information gives the owner "an opportunity to obtain an advantage over competitors who do not know or use" the information (quoting Restatement of Torts § 757,

comment (b))); <u>Jet Spray Cooler</u>, 361 Mass. at 839 (collecting cases involving trade secret customer lists).

## IV.  Conclusion

For the reasons stated above, we affirm the district court's rulings.  Costs to Appellee.